E-FILED IN OFFICE - MB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**20-C-05932-S1**
**9/8/2020 7:21 PM**

CLERK OF STATE COURT

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| LISA D. MILLER, M.D. AND MICHAEL E. DAUPHIN, )<br><br>Plaintiffs, )<br><br>v. )<br><br>BECTON, DICKINSON AND COMPANY; )<br>C. R. BARD, INC.; 9120 WHEAT ST. LLC; )<br>JOHN LAMONTAGNE; BOONE BROTHERS; )<br>RONALD PASDON; ELLEN KONDRACKI; )<br>SAMARAT KHICHI; and ELIZABETH WOODY; )<br>AND JOHN DOES NO. 1-10, )<br><br>Defendants. ) | Civil Action No. 20-C-05932-S1<br><br>**JURY TRIAL DEMANDED** |

### FIRST AMENDED COMPLAINT FOR DAMAGES

Lisa D. Miller, M.D. ("Dr. Miller") and Michael E. Dauphin ("Mr. Dauphin")

(collectively referred to as "Plaintiffs") file this First Amended Complaint for Damages against

Defendants Becton, Dickinson and Company, C. R. BARD, Inc., 9120 Wheat St. LLC, John

Lamontagne, Boone Brothers, Ronald Pasdon, Ellen Kondracki,  Samarat Khichi,  Elizabeth

Woody, and John Does No. 1-10 (collectively referred to as the "Defendants"), showing this

Court as follows:

### INTRODUCTION

1.      This action arises from injuries sustained by Dr. Miller as a proximate result of

her exposure to ethylene oxide that was used on, stored on, and emitted from the premises owned

by Defendants and used on, stored on, and emitted from the facility operated by Defendants

Copy from re:SearchGA

through their unsafe practices in the process of sterilizing medical equipment.  As a proximate result of Defendants' unsafe ethylene oxide emissions, Dr. Miller contracted, was diagnosed with, and is suffering from breast cancer.

2. The State Court of Gwinnett County has original jurisdiction over this matter, and this action is not subject to federal jurisdiction or removal to federal court under the provisions of 28 U.S.C. § 1332 because the claims asserted in this action relate to a tort committed in the State of Georgia, and one or more of the parties in interest properly joined and served as a defendant in this action is a citizen of the state in which the action has been brought. See, 28 U.S.C. § 1441(b).

## PARTIES, JURISDICTION AND VENUE

3. Plaintiff Lisa D. Miller ("Dr. Miller") is a citizen and resident of Georgia, residing at 150 Cornish Trace Drive, Covington, Newton County, Georgia 30094. Dr. Miller submits herself to the jurisdiction of this Court by filing this Complaint.

4. Defendant C. R. BARD, INC. ("Bard") is a New Jersey corporation registered to do business in this state and may be served with the Summons and a copy of this Complaint through its registered agent CT Corporation System at 289 S Culver St, Lawrenceville, Gwinnett County, Georgia, 30046-4805.

5. Defendant Becton, Dickinson and Company ("BD") is a New Jersey corporation registered to do business in this state and may be served with the Summons and a copy of this Complaint through its registered agent CT Corporation System at 289 S Culver St, Lawrenceville, Gwinnett County, Georgia, 30046-4805. BD is the corporate parent/stockholder of Bard. In December of 2017, BD completed its acquisition of Bard for approximately $25

2

Copy from re:SearchGA

billion, and as a result of their merger agreement, Bard is a wholly owned subsidiary of BD.

Defendant BD, through its ownership, agency, joint venture, and as an alter ego of Defendant

Bard, is responsible for its own negligence in the management and control of Bard and also

vicariously liable for Bard's negligent conduct.

6.      Defendant 9120 Wheat St. LLC ("Wheat St.") is a limited liability company

organized and existing under the laws of the State of Georgia and therefore a Georgia citizen.

Defendant may be served with the Summons and a copy of this Complaint through its registered

agent, John L. Travis, at its principal place of business located at 5181 N Dearing Street SE,

Covington, Newton County, Georgia 30014. Wheat St. owns a warehouse facility located in

Covington, Georgia which Bard rents out to store medical supply surplus and Ethylene Oxide.

7.      Defendant John Lamontagne ("Lamontagne") is a resident and citizen of

Rockdale County, Georgia and may be served with the Summons and a copy of this Complaint at

4820 Habersham Way NE, 89A, Conyers, Georgia 30094-4475. At all times relevant to this

Complaint, Lamontagne worked as the Facilities Manager for Defendants BD and Bard at the

Covington Facility. At all times relevant to this Complaint, Defendant Lamontagne acted in the

course and scope of his employment and was an agent of Defendants BD and Bard.

8.      Defendant Boone Brothers ("Brothers") is a resident and citizen of Gwinnett

County, Georgia and may be served with the Summons and a copy of this Complaint at 1162

Rising Moon TRL, Snellville, Georgia 30078-7394. At all times relevant to this Complaint,

Brothers worked as the Environmental Health, Safety, and Sustainability Manager for

Defendants BD and Bard at the Covington Facility. At all times relevant to this Complaint,

3

Copy from re:SearchGA

Defendant Brothers acted in the course and scope of his employment and was an agent of Defendants BD and Bard.

9.     Defendant Ronald Pasdon ("Pasdon") is a resident and citizen of Walton County, Georgia and may be served with the Summons and a copy of this Complaint at 1515 Michael Rd NW, Monroe, Georgia 30656-4383. At all times relevant to this Complaint, Pasdon worked as the Senior Manager of Sterilization and Operations for Defendants BD and Bard at the Covington Facility. At all times relevant to this Complaint, Defendant Pasdon acted in the course and scope of his employment and was an agent of Defendants BD and Bard.

10.     Defendant Ellen Kondracki ("Kondracki") is a resident and citizen of New York and may be served with the Summons and a copy of this Complaint at 2 Taft Pl, Cornwall on Hudson, Orange County, New York 12520-1711. At all times relevant to this Complaint, Kondracki worked as the VP of Sustainability and Environmental Health and Safety for Defendants BD and Bard. At all times relevant to this Complaint, Defendant Kondracki acted in the course and scope of her employment and was an agent of Defendants BD and Bard.

11.     Defendant Samarat Khichi ("Khichi") is a resident and citizen of New Jersey and may be served with the Summons and a copy of this Complaint at 229 E Dudley Ave, Westfield, Union County, New Jersey 07090-3101. At all times relevant to this Complaint, Khichi worked as the EVP General Counsel for Defendants BD and Bard. At all times relevant to this Complaint, Defendant Khichi acted in the course and scope of his employment and was an agent of Defendants BD and Bard.

12.     Defendant Elizabeth Woody ("Woody") is a resident and citizen of Washington D.C. and may be served with the Summons and a copy of this Complaint at 921 E Capitol ST

Copy from re:SearchGA

SE, D.C. County, Washington, DC 20003-3903. At all times relevant to this Complaint, Woody worked as the Vice President of Public Affairs for Defendants BD and Bard. At all times relevant to this Complaint, Defendant Woody acted in the course and scope of her employment and was an agent of Defendants BD and Bard.

13.     Defendants BD and Bard are vicariously liable for the tortious acts and omissions of all of their employees and agents, including, but not limited to, Defendants Lamontagne, Brothers, Pasdon, Kondracki, Khichi, and Woody (the "Individual Defendants") and any other individuals and agents who are determined to have contributed to Dr. Miller's harm and damages.

14.     At all times relevant to this Complaint, the Individual Defendants were acting in the course and scope of their employment and were agents of Defendants BD and Bard.

15.     Defendants BD and Bard (hereinafter referred to as "BD Bard"), have at all relevant times, operated a facility in Newton County, Georgia, that sterilizes medical equipment using the chemical Ethylene Oxide ("EtO"). The facility (the "Covington Facility") is located at 8195 Industrial Blvd, Covington, Georgia 30014 and was opened in 1967.

16.     At all times relevant to this Complaint, Defendants Lamontagne, Brothers, and Pasdon were high-level supervisors and managers employed by Defendants BD Bard at the Covington Facility (hereinafter referred to as the "Covington Managers"). Defendants Lamontagne, Brothers, and Pasdon were acting in the course and scope of their employment and were agents of Defendants BD Bard at all times relevant to this Complaint. The Covington Managers were responsible for the operation, management, and/or control of the Covington Facility, including the Covington Facility's handling of EtO.

5

Copy from re:SearchGA

17.     Defendants John Does No. 1 through 10 are believed to be Georgia or foreign corporations, partnerships, associations, adult individuals, or other legal entities that have transacted business in the State of Georgia and are responsible for the injuries and damages incurred by Dr. Miller. Once the identity and whereabouts of the John Doe Defendants are established, said Defendant(s) will be served with a copy of the Summons and Complaint as provided by law. Defendants John Does No. 1 through 10 are subject to the jurisdiction and venue of this Court.

18.     Jurisdiction is proper because all Defendants are residents and citizens of Georgia or are subject to the exercise of long-arm jurisdiction pursuant to O.C.G.A. § 9-10-91. Defendants have transacted substantial business in Georgia, created and continue to maintain a public nuisance in Georgia, and committed tortious acts and omissions in Georgia, including the tortious acts and omissions giving rise to this Complaint.

19.     Venue is proper in this Court as one or more of the Defendants are citizens of and/or maintain a registered agent for service of process in Gwinnett County, Georgia and this suit is brought against Defendants as joint tortfeasors. G.A. Const. Art. I, § 2, ¶¶ III, IV & VI; O.C.G.A. §§ 9-10-31, 9-10-93, 14-2-510.

20.     This Court has jurisdiction over the subject matter of this Complaint and the Defendants.

## RELEVANT FACTS

21.     Dr. Miller has lived in within three and a half (3.5) miles of BD Bard's Covington Facility for nineteen (19) years from 2001 to Present.

22.     Dr. Miller works as a pediatrician in Covington, Georgia.

Copy from re:SearchGA

23.     Since 2008, Dr. Miller has practiced at her office located at 4152 Baker St., Covington, Georgia 30014.

24.     Dr. Miller's office is located less than one (1) mile away from the Covington Facility.

25.     Prior to Dr. Miller opening her own practice, Dr. Miller spent seven (7) years practicing at Piedmont Newton Hospital from 2001 until 2008.

26.     Piedmont Newton Hospital is located less than 0.75 miles away from the Covington Facility.

27.     In July of 2020, Dr. Miller was diagnosed with breast cancer (infiltrating and metastatic ductal carcinoma), after physicians discovered a tumor in her right breast.

28.     Genetic testing indicated that Dr. Miller did not have a genetic predisposition to developing cancer.

29.     Dr. Miller's current projected treatment plan includes six (6) months of chemotherapy, two (2) months of radiation therapy, and a double mastectomy.

30.     At the time of her diagnosis, Dr. Miller was unaware that her disease was caused by exposure to Ethylene Oxide.

**Ethylene Oxide**

31.     Ethylene oxide ("EtO") is an industrial chemical made by reacting ethylene and oxygen.

Copy from re:SearchGA

32.     At room temperature, EtO is a colorless gas with a sweet, ether-like odor that is rapidly absorbed after inhalation.[1]

33.     EtO is rapidly absorbed after inhalation, and solutions of EtO can penetrate human skin. Most exposures to EtO occur by inhalation or skin contact.

34.     In its gaseous form, EtO leaves no residue on the items it contacts.

35.     EtO is heavier than air, and can cause asphyxiation if exposure occurs in enclosed, poorly ventilated, or low-lying areas.

36.     EtO's sweet odor does not provide sufficient warning of hazardous concentrations, as EtO's odor is detected at 500 parts per million (ppm), while OSHA's (Occupational Health and Safety Administration) permissible exposure limit is 1 ppm averaged over eight hours.

37.     EtO is a highly reactive and mutagenic agent that reacts with many constituents of body tissue causing cellular and tissue dysfunction and destruction.

38.     Although EtO was first synthesized in 1859, it achieved industrial importance during World War I as a precursor to both the coolant ethylene glycol (anti-freeze) and the chemical weapon mustard gas.

39.     Due to its flammability and extreme explosiveness, EtO is used as a main component of thermobaric weapons and must be handled and shipped as a refrigerated liquid to control its hazardous nature.

40.     The half-life of EtO in the atmosphere, assuming ambient concentrations of $5 \times 10^5$ hydroxyl radicals/cm$^3$, is 211 days. EtO degrades by reaction with hydroxyl radicals that are

---

[1] Agency for Toxic Substances and Disease Registry, "Medical Management Guidelines for Ethylene Oxide" https://www.atsdr.cdc.gov/MMG/MMG.asp?id=730&tid=133

Copy from re:SearchGA

photochemically produced. Atmospheric EtO is not removed by rain or absorption into aqueous aerosols.[2]

41.     Since the 1940's, EtO has been known to be mutagenic in many organisms, from viruses to mammals, by causing chromosomal damage.

42.     Exposure to elevated levels of EtO has been shown to cause lymphoid cancers and tumors of the brain, lung, connective tissue, uterus, and mammary gland in animals exposed by inhalation, as well as an increase in mononuclear cell leukemia and brain tumors in rats.

43.     In a 1977 article, the National Institute of Occupational Safety and Health ("NIOSH") concluded that occupational exposure to ethylene oxide may increase the frequency of genetic mutations in humans. The NIOSH report also raised concerns about the potential carcinogenicity of ethylene oxide.

44.     In 1981, the NIOSH released a subsequent report which recommended that EtO be regarded in the workplace as a potential occupational carcinogen. NIOSH based its recommendation on new evidence of EtO's carcinogenic, mutagenic, and reproductive hazards, including studies demonstrating that EtO induced cancer in experimental animals. Specifically, the studies showed an increase in instances of leukemia in line with increases of EtO concentrations, in addition to other adverse effects on reproductive health. An epidemiological investigation of Swedish workers exposed to EtO also revealed increased incidences of leukemia and other cancers.

45.     In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

_____

[2] https://www.ncbi.nlm.nih.gov/books/NBK304417/

Copy from re:SearchGA

46.     In the early 1990s, NIOSH published the largest and most informative epidemiological study of ethylene oxide. The study analyzed over 18,000 employees working with EtO at fourteen different industrial facilities sterilizing medical equipment and food spices. The study found sufficient evidence to support a causal link between exposure to ethylene oxide and increased mortality from lymphatic and hematopoietic cancers. Follow-up studies have additionally demonstrated an association between EtO exposure and breast cancer.

47.     In 1994, as a result of these findings, the World Health Organization ("WHO") listed EtO as a Group 1 human carcinogen—the agency's highest risk classification—finding ethylene oxide to be carcinogenic to humans.

48.     The U.S. National Institutes of Health (NIH) revised EtO's designation as "reasonably anticipated to be a human carcinogen" to "known to be a human carcinogen" in 2000 based on sufficient evidence of carcinogenicity from human epidemiological studies and studies on carcinogenetic mechanisms of EtO.[3]

49.     In 2016, in its IRIS study, the U.S. Environmental Protection Agency ("EPA") changed its designation of EtO from "probably carcinogenic" to "carcinogenic." The IRIS study is incorporated by reference herein.[4]

50.     The International Agency for Research on Cancer (IARC) categorized EtO as carcinogenic to humans in 2018.

---

[3] https://ntp.niehs.nih.gov/ntp/roc/content/profiles/ethyleneoxide.pdf
[4] Evaluation of the Inhalation Carcinogenicity of Ethylene Oxide, published December 2016, accessed January 3, 2019.
https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/1025tr.pdf

10

Copy from re:SearchGA

51.     A large epidemiologic study performed by the National Institute for Occupational Safety and Health (NIOSH) on sterilizer workers exposed to EtO reported positive exposure-response trends to lymphohematopoietic cancer mortality, primarily in males and in particular for lymphoid cancer (i.e., non-Hodgkin lymphoma [NHL], myeloma, and lymphocytic leukemia), and for breast cancer mortality in females. The positive exposure-response trend for female breast cancer was confirmed in an incidence study based on the same worker cohort. (Steenland et al., 2003). There is further supporting evidence for an association between EtO and breast cancer from additional studies.

52.     Non-occupational exposure to EtO may also come from tobacco, residues in spices, and other food products (Jensen, 1988; Fowles et al., 2001) and some skin-care products (Kreuzer, 1992). EtO is also formed during the combustion of fossil fuel, but the amount is expected to be negligible. Any non-occupational exposures to EtO are considered minor.[5]

### EtO's Regulatory Framework

53.     Air pollutants are defined as either criteria air pollutants or hazardous air pollutants by the U.S. Environmental Protection Agency ("EPA"). EtO is classified and regulated as a Hazardous Air Pollutant ("HAP") by the EPA.

54.     HAPs, or air toxics, are designated as such because they are either known or suspected carcinogens, or causative agents of other serious health problems such as neurological, reproductive, or respiratory problems.

---

[5] Ethylene Oxide, in Chemical Agents and Related Occupations
https://www.ncbi.nlm.nih.gov/books/NBK304417/

Copy from re:SearchGA

55.     The Clean Air Act ("CAA") identifies EtO as a HAP because it is carcinogenic in humans, is highly mutagenic and teratogenic, and has significant acute and sub-chronic exposure health effects.

56.     Unlike criteria air pollutants, air toxics regulated by the EPA, like EtO, have no universal, predefined risk levels that clearly delineate acceptable or unacceptable thresholds.

57.     Under Section 112 of the Clean Air Act (Air Toxics), the EPA is required to develop national emission standards for hazardous air pollutants (NESHAP) for source categories that have been identified as major and area sources of HAPs.

58.     The NESHAP requirement applies to sources that use at least 1 ton of EtO in sterilization operations in each 12-month period.

59.     Despite stating that it has no predefined risk level for acceptable exposure levels, the EPA has implemented a two-step risk-based decision framework for the NESHAP program which first sets an upper limit of acceptable risk at 1 in 10,000, or 100 in 1 million, lifetime cancer risk for the most exposed person. A cancer risk of 1 in 10,000 means that if 10,000 people are exposed to the same concentration of a pollutant continuously over 70 years, one person would likely contract cancer from this exposure. This risk is in addition to any risk borne by a person not exposed to the air toxic.

60.     In order to protect as many people as possible, the NESHAP framework next sets a target of an individual lifetime risk level of no higher than 1 in 1 million. Other health and risk factors are considered in order to complete an overall judgement on acceptability.[6]

---

[6] https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions#risk1

Copy from re:SearchGA

61.     Georgia EPD regulates air quality in the State of Georgia under the Georgia Air Quality Act, and also implements regulations under the Clean Air Act, pursuant to a delegation of authority from the EPA.

62.     The EPD's level of concern for EtO is 0.02 micrograms per cubic meter ($\mu g/m^3$) of air, which represents an additional cancer risk of 100 cases for every million people exposed over the course of their lifetime.[7]

63.     In the course of regulating air quality, Georgia EPD coordinates with USEPA in the adoption of rules, and relies upon information and studies done by USEPA. The Georgia EPD does not require any stricter testing, reporting, recording, or risk assessment than the USEPA.

64.     In 2006, the USEPA began a 10-year study to better understand the risks of EtO to human health. The results prompted the agency to move EtO from the list of chemicals that could cause cancer to the list of those that definitively cause cancer. The EPA also updated a key risk number for the chemical to reflect that EtO was 30 times more likely to cause certain types of cancers than scientists had previously predicted.

65.     In 2018, the USEPA used that new risk value for a periodic report that assesses health risks from releases of airborne toxins in the U.S. That report, called the National Air Toxics Assessment, or NATA, flagged 109 census tracts across the country where cancer risks were higher because of exposure to airborne toxins. Most of the risks were driven by EtO.

---

[7] https://www.epa.gov/il/ethylene-oxide-emissions-frequent-questions

Copy from re:SearchGA

## Cancer Cluster – Covington, GA

66.     For the community surrounding the BD sterilization facility and warehouse in Covington, NATA lists a total cancer risk of 200 in 1 million, based on 2014 ethylene oxide modeling data.[8]

67.     The highest risks in the U.S. were in 12 census tracts in Louisiana called "cancer alley," near facilities that make EtO or use it to make other chemicals. Other states with affected areas included Pennsylvania, Colorado, Texas, New Mexico, Delaware, New Jersey, Georgia, and Illinois.

68.     Georgia has three affected census tracts, all in metro Atlanta -- two in the Smyrna area, and one in Covington.

69.     The EPA deems the cancer risk from pollution to be unacceptable when it exceeds 100 cases for every one million people who are exposed to a chemical over the course of their lifetime. In Covington, it is estimated EtO causes approximately 214 cases for every million people exposed.

70.     People who live in the 30014 zip code, which covers the area around Defendants' sterilization and warehouse facilities, are diagnosed with cancer more frequently than residents in Newton County, and the state as a whole.

71.     In the 30014 zip code, there were 527 cases of cancer diagnosed for every 100,000 people, compared with an average of 466 cases of cancer diagnosed for every 100,000 people statewide.[9] The difference between the cancer rate in 30014 and the state is statistically significant,

---

[8] https://gispub.epa.gov/NATA/
[9] https://dph.georgia.gov/sites/dph.georgia.gov/files/Cancer_2016_Final.pdf

Copy from re:SearchGA

meaning that the increase is not merely coincidental. As a comparative measure, the state with the highest cancer rate in the country (Kentucky) has a cancer rate of 521 new cases of cancer per 100,000 people.

72.     Incidences of non-Hodgkin's lymphoma, a type of cancer linked to EtO exposure, as well as cancer rates in general, have recently tested higher in the 30014 zip code compared to the overall average in Georgia. For instance, non-Hodgkin's lymphoma rates have been rising an average of nearly 7% each year from 2007 to 2016 in this zip code. The increase is statistically significant, according to public health officials.

73.     Rates of breast cancer, another type of cancer linked to EtO exposure, peaked in the 30014 zip code between 2010 and 2014, with 139 cases diagnosed for every 100,000 people.

### Defendants' Operations

74.     Defendants began operations in Georgia upon opening a Urological Division in Covington, Georgia in 1967.

75.     In 1967, Defendants began using, and continue to use, EtO to sterilize medical devices in Covington, Georgia.

76.     Defendants' Covington, Georgia facilities have continuously used EtO since opening without any known long-term periods of non-use.

77.     Before 1987, Defendants neither reported nor provided measurements for the amount of EtO its sterilization facility regularly released into the atmosphere.

78.     For the first time in its history, Defendants self-reported emissions in 1987 by admitting that 75,306 lbs. of EtO was released into the atmosphere that year. By 1989, Defendants' EtO emissions surged to 101,755 lbs.

15

Copy from re:SearchGA

79.    Emissions reported by Defendants have never included fugitive emissions, which occur when EtO escapes from anywhere other than the facility's stack (which is the only area actually measured) and is not captured by pollution controls.

80.    Between 2004 and 2018, Defendants self-reported using 5,212,188.5 lbs. of EtO at the Covington Facility.

81.    Defendants claim they sterilize 250 million medical devices annually at their facilities in Covington and Madison.

82.    In addition to its Covington Facility, Defendants operate a warehouse, referred to as a Global Distribution Center ("GDC"), which stores products previously sterilized at Defendants' Covington and Madison, Georgia facilities. The GDC is located at 4201 Lochridge Blvd, Covington, GA 30014, which is 1.6 miles from Defendants' Covington Facility.

83.    Defendants claim they are in full compliance with laws and regulations surrounding the safe use of EtO, where all facilities have permits for EtO emissions, and operate well below the threshold allowed by those permits.[10]

84.    Despite these claims, Defendants have neither reported emissions from the GDC or any additional warehouses they maintained, nor did Defendants apply for a permit for those emissions until they received a violation letter from EPD after it was revealed that Defendants' Covington warehouse, where it stored sterilized products, was releasing excessive levels of EtO.

---

[10] *EPD et. al. v. Becton, Dickinson and Company*; Defendants' Response in Opposition to Plaintiff's Motion for Temporary Restraining Order.

Copy from re:SearchGA

85.     In fact, the Covington Managers all personally witnessed, directed, cooperated, controlled, and/or participated in the improper disposal and/or release of fugitive emissions of EtO from the GDC and/or the Covington Facility.

86.     In August 2019, the Georgia EPD attempted to force Defendants to take additional measures to reduce their toxic EtO emissions as soon as possible, with an emphasis on reducing fugitive emissions.

87.     On August 20, 2019, Defendant Samarat Kihichi, EVP General Counsel for Defendant BD, drafted a letter to Governor Brian Kemp regarding, in part, Defendant BD's air pollution technology used in its facilities. In the letter, Defendant Kihichi claimed that Defendant BD "invest[s] in and deploy[s] best available air pollution control technology at our facilities to achieve greater than 99.5% destruction of EtO in our plant stack emissions."

88.     Despite claiming that BD Bard deploys the "best available air pollution control technology," Defendant Elizabeth Woody emailed the Governor's office on August 20, 2019 explaining that BD Bard had to order and implement nearly $8 million in additional equipment and technology to bring its fugitive emissions control system up to current best standards. At the time of installation, this technology sought by BD Bard was already in use by others in the industry.

89.     On December 20, 2019, Defendants disclosed a third facility to EPD, located on Wheat Street ("Wheat Street facility"), which was operating without a permit.

90.     In response, EPD shutdown the Wheat Street facility and ordered Bard to remove all of its inventory from the premises. Bard represented that the facility was closed as of December 23, 2019.

Copy from re:SearchGA

91.     Defendants were ordered to obtain a permit for its warehouse, which has still not happened to this day.

92.     Defendants claim that since 1991, the Covington Facility has used a regenerative thermal oxidizer, which allegedly treats its exhaust air.

93.     Defendants claim its Covington Facility achieves greater than 99.95% destruction of EtO in plant emissions. However, these numbers do not account for fugitive emissions. Rather, Defendants' figures are derived only from its stack testing, which is meant to measure the EtO emitted through the Facility's filtration system alone.

94.     Defendants readily admit that stack testing and air monitoring are completely different. Stack testing uses a probe inserted into the stack to record the thermal oxidizer's destruction efficiency, while air monitoring measures EtO in the ambient air surrounding a facility.

95.     EtO is released daily into the atmosphere from Defendants' Covington Facility, not only through the stack atop the Facility but also as unmonitored fugitive emissions.

96.     Prior to a study performed by Montrose Environmental Group, Inc. ("Montrose Environmental") between September 17, 2019 to September 23, 2019, no independent air monitoring had ever been done to assess the EtO levels in the areas surrounding the Covington Facility. That is, no independent air monitoring had occurred at the Covington Facility since its opening in 1967.

97.     Montrose Environmental's study analyzed air samples from 11 different locations, including several test sites at the BD sterilization facility, locations near Covington Square, the Covington Mill and Settlers Grove neighborhoods, south Covington, and the Covington Airport.

Copy from re:SearchGA

98.     The EtO levels measured in Covington Mill, a neighborhood sitting just southwest of Defendants, over seven days of testing, ranged from 0.6 to 15.3 micrograms per cubic meter of air ($\mu g/m^3$). The highest level, 15.3 $\mu g/m^3$, taken on September 22, 2019, is 765 times higher than the EPA's acceptable level of 0.02 $\mu g/m^3$.[11]

99.     In Settler's Grove, the closest neighborhood to the east of Defendants, the levels ranged from nondetectable to 13.8 $\mu g/m^3$. 13.8 $\mu g/m^3$ is 690 times the EPA's level of concern for EtO.

100.     Defendants' own testing results near its sterilization facility, analyzed by a company called Ramboll, or Ramboll Group A/S, revealed levels ranging from 0.3 to 10.5 $\mu g/m^3$ between September 17, 2019 through September 23, 2019.

101.     Prior to the test results becoming public, Defendants reported an 8-day leak at its Covington facility, stemming from an improperly closed valve, spilling at least 50 lbs. of EtO into the community. However, Defendants represented that the leak likely had little to no effect on the test results. "Given the variability of the results, with many days seeing only background levels of EtO, BD does not believe the unintended release of EtO that BD voluntarily reported had any significant bearing on these results," Defendants stated in a media release.[12]

102.     After receiving the preliminary air testing results, Covington officials requested that Defendants temporarily cease operations using EtO until further emissions control equipment could be put in place.

---

[11] https://www.epa.gov/il/ethylene-oxide-emissions-frequent-questions
[12] https://etosafety.bd.com/wp-content/uploads/2019/10/BD_Statement_AirMonitoring_FINAL_20191016-latest-version.pdf

Copy from re:SearchGA

103.    Georgia EPD described the results as "deeply troubling" and said it would double testing frequency at the plant in order to "determine what regulatory action may be necessary for the surrounding "community's safety."[13]

104.    On October 21, 2019, Attorney General Chris Carr, on behalf of Governor Kemp and Georgia EPD, filed an injunction based upon the following assertions:

a.    In August 2018, USEPA published the National Air Toxics Assessment (NATA) which is periodically updated, based on source data collected beginning in 2014 and including 2014 EtO emissions data from Defendants' Facility.[14] The results of the NATA showed that a census tract located near the Facility warranted further study.

b.    As a result of the NATA, EPD contacted Defendants to request information regarding its emissions of EtO. EPD used the updated data from Defendants to conduct computer air modeling regarding the risks to the public in the area of the Facility as a result of EtO emissions. On June 7, 2019, EPD completed its report memo: Modeling Analysis for EtO BD, Covington, Newton County, GA memo (the Modeling Memo). See the Modeling Memo, attached as Exhibit B.

c.    The concentration modeled at some residences was above the Acceptable Ambient Concentration (AAC) for EtO in Appendix A of EPD's Guideline for Ambient Impact Assessment of Toxic Air Pollutant Emissions.

---

[13] Stanford, Larry. "Deeply Troubling: EPD investigates leak at BD after release of Covington's EtO air testing results," The Citizens. https://www.rockdalenewtoncitizen.com/news/deeply-troubling-epd-investigating-leak-at-bd-after-release-of-covington-eto-air-testing-results/article_244c5870-f0fe-11e9-8eac-af6cdc39633e.html
[14] https://www.epa.gov/national-air-toxics-assessment

Copy from re:SearchGA

d.  If the modeled concentration of a toxic air pollutant is above the AAC, EPD requires that the company either: (1) reduce emissions of that air toxic, or (2) take other steps to ensure that the concentrations at nearby residences and businesses are below the AAC for that pollutant, or (3) demonstrate that they reduced emissions of that pollutant to the maximum extent possible. EPD shared the Modeling Memo with Defendants in June of 2019 and in August of 2019 requested that Defendants take steps to reduce its emissions of the toxic air pollutant EtO as soon as possible, with an emphasis on reducing fugitive emissions.

e.  EPD has worked diligently to encourage Defendants to reduce its EtO emissions at the Facility. But, EPD's efforts have been to no avail. Despite public statements to the contrary, Defendants have not been a cooperative partner with EPD. To date, Defendants have not submitted a permit modification application or any other substantive document to EPD indicating that they have made progress toward reducing EtO emissions at the Facility. In sum, based upon information that has come to EPD's attention, it appears that Defendants have taken few, if any, demonstrable steps to reduce emissions of EtO at the Facility.

f.  Defendants' lack of progress toward achieving a reduction of EtO emissions is in stark contrast to the response that EPD has gotten from other similar commercial sterilizers in Georgia. EPD asked two other commercial sterilizers to submit permit modifications and reduce their EtO emissions. Those facilities complied with EPD's request and are progressing in their efforts to reduce EtO emissions.

21

Copy from re:SearchGA

g.  Defendants' sterilization process at the Facility involves placing the medical devices in a vented sterilization chamber and introducing EtO gas to the chamber to accomplish sterilization. Once sterilization is complete, a vacuum process pulls EtO from the sterilization chamber through the sterilizer chamber vent to the emission control device. Finally, the medical devices are aerated following sterilization.

h.  On September 23, 2019, Defendants discovered that, due to operator error, the exhaust valve on the chamber vent that is part of the vacuum process for sterilizer chamber 5 was not fully closed. That valve, while opened, vented EtO into the atmosphere. See the Incident Report at Exhibit C.

i.  Upon further investigation, Defendants determined that the Facility had intermittently released EtO into the atmosphere from September 15, 2019 through September 22, 2019 as a result of the partially open valve. The release was in violation of the Permit. See the Incident Report at Exhibit C.

j.  At all times while the Covington Facility intermittently released EtO into the atmosphere from September 15, 2019 through September 22, 2019 as a result of the partially open valve, the Covington Managers were responsible for the operation, management, and/or control of the Covington Facility, including the Covington Facility's handling of EtO.

k.  EPD has been conducting weekly phone calls with Defendants since August 2019 for the purpose of seeking updates on Defendants' activities toward accomplishing a reduction in the EtO emissions at the Facility. On September 24, 2019, during a

22

Copy from re:SearchGA

routine weekly call, Defendants first notified EPD that a release of EtO had occurred. During the call with EPD, which occurred the day after Defendants had discovered the release, Defendants failed to recognize or disclose the duration and extent of the release to EPD, representing initially that the release lasted one day and involved the release of only two pounds of EtO. EPD requested additional information.

l.   Three days later, on September 27, 2019, Defendants provided additional information to EPD in an Incident Report indicating a much longer and more significant event. Specifically, on page 3 of its Incident Report Defendants calculated that 54.5 pounds of EtO were released into the atmosphere over the course of eight (8) days as a result of operator error. See the Incident Report at Exhibit C.

m.   Defendants' Incident Report indicates that between September 15, 2019 and September 22, 2019, Defendants used a total of 2,050 pounds of EtO in sterilization chamber number five with the valve partially open. See the Incident Report at Exhibit C, p. 3.

n.   The release of 54.5 pounds of EtO during the eight-day period when 2,050 pounds of EtO was used in sterilization chamber number five indicates a 97.3% reduction of EtO emissions to the atmosphere from that sterilization chamber vent. Permit Condition 2.3 requires that, "the EtO emissions to the atmosphere from each sterilizer chamber vent shall be reduced by at least 99%." Thus, the release constitutes a violation of the Permit. See the Permit, p. 2 at Exhibit A.

23

Copy from re:SearchGA

o.  Defendants, through Defendant Lamontagne, represented in its Incident Report that by September 30, 2019 it would ensure all technicians were trained on operation of the style of valve that was left partially open. To date, Defendants have not provided EPD with concrete evidence that the training has taken place. See the Incident Report at Exhibit C, p. 2.

p.  Defendants' Incident Report also indicated it would install blanks on the outlet to the vacuum exhaust valve to prevent flow regardless of valve position or condition. Defendants' target date for completion of the installation was October 25, 2019. With knowledge of the possibility of unintended release of EtO, Defendants continued normal operations despite the risk of another negligent release during the interim period.

q.  As a result of public concern regarding the emissions of EtO at the Facility, the City of Covington (the City) contracted for seven (7) days of ambient air monitoring in the area surrounding the Facility. The City notified Defendants, EPD, and the public of its plan before the air monitoring commenced. The City worked with Defendants and requested that a Defendants official certify daily that the company was conducting normal operations during the period of air monitoring. Defendants agreed to do so. The City's contractor conducted the air monitoring from September 17, 2019 through September 23, 2019.

r.  From September 17, 2019 through September 23, 2019, Defendants provided the City of Covington with the requested Affidavits certifying that the Facility was operating normally during the seven-day test period. Specifically, Defendant

Copy from re:SearchGA

Ronald Pasdon repeatedly certified that Defendants were conducting their usual operations in accordance with their 2019 Standard Operating Procedures. See the Affidavits attached as Exhibit D.

s.  Defendant Pasdon's Affidavits were provided to the City by Defendants even though Defendants were intermittently releasing EtO into the atmosphere starting on September 15, 2019 - two days before the air monitoring commenced, through almost the entire monitoring period, which ended on September 23, 2019 - the day Defendants discovered the release. Defendants either acted in bad faith in providing the Affidavits to the City or Defendants acted negligently because Defendants either knew that it was experiencing an unauthorized release in violation of the Permit or it should have known.

t.  The City of Covington's contractor conducted air testing in 11 locations in Newton County and other counties and on October 16, 2019, the City shared its ambient air testing results with EPD. While the measured concentrations varied widely and include EtO emitted from other sources, the average concentration measured was 1.97 $\mu g/m^3$, which is well above 0.02 $\mu g/m^3$, the concentration that USEPA considers as posing an acceptable risk, if exposed to that concentration continuously over a lifetime.

u.  Of greatest concern to EPD are the average concentrations measured in two neighborhoods close to Defendants: (1) the average concentration in Settler's Grove Area was 4.08 $\mu g/m^3$ and (2) the average concentration in the Covington Mill Area was 6.45 $\mu g/m^3$. EPD submits that the higher concentrations measured in the

25

Copy from re:SearchGA

neighborhoods close to Defendants during the monitoring period indicated that Defendants' emissions of EtO increased the EtO concentrations in the ambient air in those two areas. The City of Covington's air monitoring results are attached as Exhibit E.

v.   Permit Condition 3.1 requires Defendants to, "take all reasonable precautions with any operation, handling, transportation, or storage facilities to prevent fugitive emissions of air contaminants." Permit, p. 2 at Exhibit A.

w.  USEPA defines "fugitive emissions" in the regulations promulgated under Title V of the Clean Air Act as "those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally-equivalent opening." 40 CFR § 70.2.

x.   Ga. Comp. R. & Regs. 391-3-1-.02(2)(a)(l) provides: "No person owning, leasing or controlling the operation of any air contaminant sources shall willfully, negligently or through failure to provide necessary equipment or facilities or to take necessary precautions, cause, permit, or allow the emission from said air contamination source or sources of such quantities of air contaminants as will cause, or tend to cause, by themselves or in conjunction with other air contaminants a condition of air pollution in quantities or characteristics or of a duration which is injurious or which unreasonably interferes with the enjoyment of life or use of property in such area of the State as is affected thereby. Complying with any of the other paragraphs of these rules and regulations or any subparagraphs thereof, shall in no way exempt a person from this provision."

Copy from re:SearchGA

y.  Given USEPA's determination that EtO is a known carcinogen and EPA's "total cancer unit risk" discussed in paragraph 44, above, in which EPA estimated a possible increased cancer risk from continuously inhaling a specified concentration of EtO over a lifetime, EPD is working to reduce EtO emissions in Georgia. Based on information provided to EPD by Defendants, EPD estimated that Defendants are allowing 555.7 pounds per year of fugitive emissions of EtO into the atmosphere in the immediate vicinity of the Facility. Modeling Memo at Exhibit B.

z.  Defendants have had the ability to control the fugitive emissions but have not acted expeditiously to accomplish reductions. In short, Defendants have failed or refused to recognize the urgency EPD believed, and still believes, is necessary to accomplish a reduction of EtO in a timely manner and to act accordingly.

105.   Defendants called the injunction "an unnecessary move" and said Governor Brian Kemp, the EPD, and Covington Mayor Ronnie Johnston "are ignoring science and facts and may be creating a risk to the health and safety of patients."[15]

106.   On October 28, 2019, Defendants' sterilization facility in Covington was closed pursuant to a Consent Order granting the EPD's requested injunction against Defendants, from October 30 to November 6, 2019.

107.   Due to EPD's oversight as a condition of the consent order of October 28, 2019, Defendants provided estimates of fugitive EtO emissions occurring at offsite warehouses in

---

[15] https://www.medicaldesignandoutsourcing.com/georgia-seeks-temporary-halt-to-bd-sterilization-operation/

Copy from re:SearchGA

Newton County, showing that the GDC alone emitted 5,600 pounds of EtO per year. A Notice of Violation was issued.[16]

108.   EPD's notice stated that EtO emissions from the GDC were so high that Defendants should have obtained a permit for its GDC operations.

109.   EPD suspended operations at the GDC warehouse for new products from December 23, 2019 to January 6, 2020.

110.   On December 18, 2019, Georgia's Environmental Protection Division cited Defendants for operating its GDC without an air quality permit.[17]

111.   EPD estimated the emissions from Defendants' GDC exceeded those of its sterilization facility, which had also exceeded its permit.

112.   EPD also ordered Defendants to conduct air monitoring at the nearest residential area and nearest school, as well as weekly indoor air monitoring and outdoor fence line monitoring at the GDC, in addition to EPD's continued monitoring of the Covington area.

113.   Defendants were ordered to submit a permit application for the GDC to EPD by February 3, 2020.

114.   To date no permit application for Defendants' warehouses has been sought by Defendants.

---

[16] EPD issues Notice of Violation to BD in Covington, in The Covington News, https://www.covnews.com/news/epd-issues-notice-violation-bd-covington/
[17] December 18, 2019 Georgia EPD Notice of Violation to Becton, Dickinson and Company; December 23, 2019 BD Letter to Georgia EPD, found at https://epd.georgia.gov/bd-becton-dickinson-and-company-madison

28

Copy from re:SearchGA

115.     Defendants were ordered to disclose to EPD why the amount of fugitive EtO emissions from sterilized devices was higher than Defendants estimated in its air-quality permits for its Covington and Madison sterilization plants.

116.     Subsequently, EPD and BD Bard entered into two amendments to the Consent Order on January 15, 2020 and March 25, 2020 for further monitoring and compliance of BD Bard's Covington facility.

## COUNT I: NEGLIGENCE
### (*All Defendants*)

117.     Dr. Miller was exposed to harmful levels of EtO as a proximate result of the acts and omissions of each Defendant, individually and collectively.

118.     As a proximate result of each Defendants' negligent acts and omissions, individually and collectively, Dr. Miller developed and was otherwise diagnosed as suffering from breast cancer.

119.     At all times relevant, each Defendant owed a duty to exercise reasonable care in the operation of the Covington Facility, including regulating the emission of EtO and truthfully disclosing to the public the accurate levels of EtO being released into their air.

120.     At all times relevant hereto, each Defendant knew, or should have known, of the carcinogenic properties of EtO generally and also of that being omitted from the work of the Covington Facility.

121.     At all times relevant hereto, each Defendant knew or should have known the foreseeability of harm to others, like Dr. Miller, if they emitted dangerous amounts of EtO into the air via direct emissions and fugitive emissions.

122.     Defendants breached their duty in one or more of the following ways:

Copy from re:SearchGA

a. Emitting EtO into the air from the Covington Facility;

b. Emitting excessive, unnecessary, and/or dangerous volumes of EtO into the air from the Covington Facility;

c. Using EtO as part of its sterilization process when safer alternatives could accomplish the same or similar business purposes without presenting the same level of risk to human health and well-being;

d. Disregarding safe methods to adequately control EtO emissions from the Covington Facility;

e. Failing to report fugitive emissions of EtO;

f. Placing its own economic interest above the health and well-being of those who live or work in the community near the Covington Facility;

g. Failing to warn or advise Dr. Miller, as well as those who live or work in the community near the Covington Facility, that they are being exposed to EtO;

h. Failing to warn or advise Dr. Miller, as well as those who live or work in the community near the Covington Facility, that they were breathing in EtO;

i. Failing to warn or advise Dr. Miller, as well as those who live or work in the community near the Covington Facility, that it was emitting a known carcinogen into the air from its Covington Facility in Newton County;

j. Failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from the Covington Facility;

k. Failing to adequately study and test the effect of its EtO emission from the Covington Facility on the quality of air;

30

Copy from re:SearchGA

l.   Misleading government entities and the public in general about the nature and extent of EtO emissions from the Covington Facility;

m.   Concealing from the public the nature and extent of EtO emissions from the Covington Facility;

n.   Failing to adequately study and test the effect of its EtO emissions from the Covington Facility on the health and well-being of those who live and work in the nearby community; and

o.   Subjecting Dr. Miller and those who live and work near the Covington Facility to an elevated cancer risk.

123.    The Defendants were additionally negligent in the hiring, training, supervision, and retention of their employees and agents, and other employees and agents who participated in the activities of the Covington Facility.

124.    Defendants' negligent, grossly negligent, willful, wanton and reckless conduct, as described herein, was the proximate cause of Dr. Miller's illness and injuries, as a result of which Dr. Miller has suffered damages in the form of medical expenses, physical disability, mental and physical pain and suffering, extreme emotional distress, and other damages as can be proven at a trial of this action.

125.    Dr. Miller is entitled to recover damages against each Defendant for their individual and collective acts of negligence in an amount to be proven at trial.

### COUNT II: PUBLIC NUISANCE (COMMON LAW)
### *(All Defendants)*

126.    At all relevant times, Defendants knew or should have known EtO to be hazardous and harmful to humans.

Copy from re:SearchGA

127.     At all relevant times, Defendants knew or should have known that the levels of EtO gas emitted from the Covington Facility would have a toxic, poisonous, and deleterious effect upon the health, safety, and wellbeing of people living and working in the community.

128.     Defendants knew or should have known that the levels of EtO gas emitting from the Covington Facility would have a toxic, poisonous, and deleterious effect upon the health, safety, and wellbeing of persons breathing it on a regular basis.

129.     Despite having knowledge that the levels of EtO gas emitting from the Covington Facility would have a toxic, poisonous, and deleterious effect upon those in the surrounding community, Defendants continues their operation, maintenance, and use of the Covington Facility and continues to endanger the general public who live and work in the area surrounding the Covington Facility by causing the those in the community to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

130.     Defendants' emissions of carcinogenic EtO caused direct harm to everyone in the community who came into contact with its hazardous emissions.

131.      Defendants had a duty to warn, identify, and disclose the presences of the toxic levels of EtO gas emitting from its Covington Facility and have failed to warn the public of the toxic, poisonous, and deleterious effect upon the health, safety, and wellbeing of those in the community where Defendants conducts their business.

132.     The tortious actions and omissions of Defendants constitute a public nuisance, causing dangers to all members of the public who come into contact with it, and caused special damage to Dr. Miller, including but not limited to extreme mental and emotional damage and physical pain and suffering. Because of the tortious actions of Defendants, Dr. Miller has sustained

32

Copy from re:SearchGA

and will continue to sustain severe and permanent damage to her health due to the emission of EtO.

133.    Defendants thereby knowingly and/or recklessly subjected a considerable and increasing number of individuals from the public at large to the harm inherent in the levels of its emissions of carcinogenic EtO.

134.    The tortious actions of Defendants constitute a public nuisance and caused special damage to Dr. Miller's health, including but not limited to extreme mental and emotional damage and physical pain and suffering.

135.    Defendants failed to act on their knowledge of the toxic levels of EtO gas emitting from its Covington Facility, and failed to act to correct, prevent, or warn of the general public of the dangerous environment created through Defendants' emissions of EtO, which continuously invaded and contaminated the areas surrounding the Covington Facility, including Dr. Miller's residence. Defendants' failure to take appropriate action to remedy or reduce the danger to the public, including Dr. Miller, allowed the toxic emissions from the Covington Facility to continue unabated, thereby creating a nuisance that continues to this day.

136.    As a proximate result of the Defendants' operation, maintenance, and use of the Covington Facility, and the public nuisance created thereby, Dr. Miller, and the general public's, right to breathe clean air without dangerous levels of carcinogens such as EtO was eliminated and/or severely diminished.

137.    As a proximate result of Defendants' operation, maintenance, and use of the Covington Facility, and the public nuisance created thereby, EtO continuously invaded and contaminated the community surrounding the Covington Facility, including Dr. Miller's residence.

33

Copy from re:SearchGA

138.     As a proximate result of Defendants' use and emission of EtO, and the public nuisance created thereby, Dr. Miller and the general public were exposed to and inhaled a significant, meaningful, and more than *de minimis* amount of EtO.

139.     As a proximate result of Defendants' use and emission of EtO, and the public nuisance created thereby, all members of the general public who came into contact with it suffered damages, and Dr. Miller sustained and will continue to sustain special damages, including but not limited to, severe and permanent damage to her health due to the emission of EtO.

140.     As a proximate result of Dr. Miller's inhalation of EtO from the Covington Facility, Dr. Miller has suffered damages in the form of medical expenses, physical disability, mental and physical pain and suffering, extreme emotional distress, and other damages to be proven at trial.

### COUNT III: PUBLIC NUISANCE (O.C.G.A. § 41-1-1)
### *(All Defendants)*

141.     A public nuisance is one that "tends to the immediate annoyance of the public in general, is manifestly injurious to the public health or safety, or tends greatly to corrupt the manners and morals of the public." The negligence by Defendants in failing to act to correct, prevent, or warn of the general public of the dangerous environment created through Defendants' emissions of EtO, which continuously invaded and contaminated the areas surrounding the Covington Facility, including Dr. Miller's workplaces, was and is injurious to public health and safety and contributes to the corruption of the manners and morals of the public, including, but not limited to, the residents in the areas surrounding the Covington Facility and all other members of the general public who came near the facility. The Covington Facility is directly adjacent to numerous residences in the community.

34

Copy from re:SearchGA

142.     Defendants knew or should have known that the levels of EtO gas emitting from the Covington Facility would have a toxic, poisonous, and deleterious effect upon the health, safety, and wellbeing of persons breathing it on a regular basis.

143.     Despite having knowledge that the levels of EtO gas emitting from the Covington Facility would have a toxic, poisonous, and deleterious effect upon those in the surrounding community, Defendants continues its operation, maintenance, and use of the Covington Facility and continues to endanger the general public who live and work in the area surrounding the Covington Facility by causing the those in the community to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

144.     Defendants' emissions of carcinogenic EtO caused direct harm to everyone in the community who came into contact with its hazardous emissions.

145.     Defendants had a duty to warn, identify, and disclose the presence of the toxic levels of EtO gas emitting from its Covington Facility and have failed to warn the public of the toxic, poisonous, and deleterious effect upon the health, safety, and wellbeing of those in the community where Defendants conduct their business.

146.     The tortious actions and omissions of Defendants constitute a public nuisance, causing dangers to all members of the public who come into contact with it, and caused special damage to Dr. Miller, including but not limited to extreme mental and emotional damage and physical pain and suffering. Because of the tortious actions of Defendants, Dr. Miller has sustained and will continue to sustain severe and permanent damage to her health due to the emission of EtO.

Copy from re:SearchGA

147.     Defendants thereby knowingly and/or recklessly subjected a considerable and increasing number of individuals from the public at large to the harm inherent in the levels of its emissions of carcinogenic EtO.

148.     The tortious actions of Defendants constitute a public nuisance and caused special damage to Dr. Miller's health, including but not limited to extreme mental and emotional damage and physical pain and suffering.

149.     Defendants failed to act on their knowledge of the toxic levels of EtO gas emitting from its Covington Facility, and failed to act to correct, prevent, or warn of the general public of the dangerous environment created through Defendants' emissions of EtO, which continuously invaded and contaminated the areas surrounding the Covington Facility, including Dr. Miller's residence. Defendants' failure to take appropriate action to remedy or reduce the danger to the public, including Dr. Miller, allowed the toxic emissions from the Covington Facility to continue unabated, thereby creating a nuisance that continues to this day.

150.     As a proximate result of the Defendants' operation, maintenance, and use of the Covington Facility, and the public nuisance created thereby, Dr. Miller, and the general public's, right to breathe clean air without dangerous levels of carcinogens such as EtO was eliminated and/or severely diminished.

151.     As a proximate result of Defendants' operation, maintenance, and use of the Covington Facility, and the public nuisance created thereby, EtO continuously invaded and contaminated the community surrounding the Covington Facility, including Dr. Miller's residence.

Copy from re:SearchGA

152.     As a proximate result of Defendants' use and emission of EtO, and the public nuisance created thereby, Dr. Miller and the general public was exposed to and inhaled a significant, meaningful, and more than *de minimis* amount of EtO.

153.     As a proximate result of Defendants' use and emission of EtO, and the public nuisance created thereby, all members of the general public who came into contact with it suffered damages, and Dr. Miller sustained and will continue to sustain special damages, including but not limited to, severe and permanent damage to her health due to the emission of EtO.

154.     As a proximate result of Dr. Miller's inhalation of EtO from the Covington Facility, Dr. Miller has suffered damages in the form of medical expenses, physical disability, mental and physical pain and suffering, extreme emotional distress, and other damages to be proven at trial.

### COUNT IV: PRIVATE NUISANCE
*(All Defendants)*

155.     The right of enjoyment of private property is an absolute right of every citizen

156.     At all relevant times, Defendants knew or should have known that EtO is hazardous and harmful to humans.

157.     At all relevant times, Defendants knew or should have known that the levels of EtO gas emitted from the Covington Facility would have a toxic, poisonous, and deleterious effect upon the health, safety, and wellbeing of people living and working in the community.

158.     Defendants knew or should have known that the levels of EtO gas emitting from the Covington Facility would have a toxic, poisonous, and deleterious effect upon the health, safety, and wellbeing of persons breathing it on a regular basis.

Copy from re:SearchGA

159.     Defendants' operation, maintenance, and use of the Covington Facility caused those who live and work in the area surrounding the Covington Facility to breath air contaminated with high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

160.     Defendants' emissions of carcinogenic EtO interfere with Dr. Miller's enjoyment of property and cause hurt, inconvenience, or damage to Dr. Miller.

161.     As a proximate result of the Defendants' operation, maintenance, and use of the Covington Facility, Dr. Miller's right to breathe clean air without dangerous levels of carcinogens such as EtO was eliminated and/or severely diminished.

162.     As a proximate result of Defendants' operation, maintenance, and use of the Covington Facility, EtO continuously invaded and contaminated the areas surrounding the Covington Facility, including Dr. Miller's office.

163.     As a proximate result of Defendants' use and emission of EtO, Dr. Miller was exposed to and inhaled a significant, meaningful, and more than *de minimis* amount of EtO.

164.     As a proximate result of Defendants' use and emission of EtO, Dr. Miller sustained and will continue to sustain severe and permanent damage to her health due to the emission of EtO.

165.     As a proximate result of Dr. Miller's inhalation of EtO from the Covington Facility, Dr. Miller has suffered damages in the form of medical expenses, physical disability, mental and physical pain and suffering, extreme emotional distress, and other damages to be proven at trial.

Copy from re:SearchGA

## COUNT V: ULTRAHAZARDOUS ACTIVITY/STRICT LIABILITY
### *(BD BARD, Covington Managers, Wheat St.)*

166.    Defendants' use and emission of EtO from the Covington Facility constitutes an ultrahazardous activity.

167.    Defendant Wheat St. owns and operates a warehouse in which it allowed the storage of EtO which constitutes and ultrahazardous activity.

168.    Defendants' use and emission of EtO created a high degree of risk to those who live and work in the surrounding area. Further, the likelihood of cancer caused by Defendants' use and emission of EtO is significantly higher than the level of acceptable risk.

169.    Defendants' use and emission of EtO is especially inappropriate given the densely populated residential and commercial area in which the Covington Facility is located.

170.    The activities, as conducted by each and every Defendant are exceedingly dangerous and offer little to no value to the surrounding community.

171.    Because Defendants' activities are ultrahazardous, they are strictly liable for any injuries proximately resulting therefrom.

172.    As a proximate result of Defendants' ultrahazardous activities, Dr. Miller was exposed to and inhaled carcinogenic amounts of EtO.

173.    As  a proximate result of Dr. Miller's inhalation of EtO from the Covington Facility, Dr. Miller has suffered damages in the form of medical expenses, physical disability, mental and physical pain and suffering, extreme emotional distress, and other damages as can be proven at a trial of this action.

Copy from re:SearchGA

## COUNT VI: AIDING AND ABETTING TORTIOUS CONDUCT
### (*Wheat St.*)

174.    Defendant Wheat St. owns and rents to Defendant Bard the property upon which Defendant Bard stored EtO sterilized products.

175.    In addition to leasing the property, Defendant Wheat St. permitted BD Bard to store products emitting EtO into the atmosphere despite knowing BD Bard was required to obtain operating permits from Newton County. In fact, as the owner of the property, Defendant Wheat St. was itself required to obtain a permit that would allow the emission of EtO from its property.

176.    At all times Defendant Wheat St. assisted BD Bard, Defendant Wheat St.  knew that BD Bard's operations would emit EtO into the atmosphere.

177.     At all times Defendant Wheat St. assisted BD Bard, Defendant Wheat St.  knew or should have known that EtO is carcinogenic to humans.

178.    Without assistance from Defendant Wheat St. in leasing the facility to BD Bard even though they did not have the required operating permits, the Bard Defendants would not have been able to emit additional harmful levels of EtO into the area surrounding the property.

179.    As a proximate result of Defendant Wheat St.'s assistance, the Bard Defendants negligently breached their duty and failed to exercise ordinary care for the health and well-being of Dr. Miller.

180.    Defendant Wheat St. knowingly assisted, aided, and abetted the Bard Defendants in their negligence against Dr. Miller, and is liable to Dr. Miller, along with the other Defendants, for causing and/or contributing to Dr. Miller's illness and injuries.

Copy from re:SearchGA

181.     As a proximate result of the actions and omissions of Defendant Wheat St., Dr. Miller has suffered damages in the form of medical expenses, physical disability, mental and physical pain and suffering, extreme emotional distress, and other damages to be proven at trial.

## COUNT VII: *RESPONDEAT SUPERIOR* AND/OR VICARIOUS LIABILITY
### (*BD Bard, Individual Defendants*)

182.     Upon information and belief, at all times pertinent to this Complaint, the Individual Defendants were employees and/or agents of BD Bard.

183.     Upon information and belief, at all times pertinent to this Complaint, the Individual Defendants were acting within the course and scope of their employment and/or agency with BD Bard.

184.     Upon information and belief, at all times pertinent to this Complaint, the Individual Defendants were acting in furtherance of the interests of BD Bard.

185.     BD Bard is therefore liable under the doctrines of *respondeat superior*, vicarious liability and/or statutory employer liability for the tortious acts and/or omissions of their employees and/or agents.

186.     As a proximate cause of the acts and omissions of BD Bard, by and through the Individual Defendants, Dr. Miller has suffered damages in the form of medical expenses, physical disability, mental and physical pain and suffering, extreme emotional distress, and other damages as can be proven at a trial of this action.

## COUNT VIII: LOSS OF CONSORTIUM
### (*BD BARD*)

187.     Plaintiff Michael E. Dauphin is the spouse of Dr. Miller.

Copy from re:SearchGA

188.    As a proximate result of the wrongful and tortious acts of Defendants, Plaintiff Michael E. Dauphin. has suffered the loss of affection, society, comfort, support, consortium, and companionship of his wife, Dr. Miller.

189.    Defendants' wrongful conduct as alleged above was the proximate cause of the damages suffered by Dr. Miller and has caused Plaintiff Michael E. Dauphin to incur damages in an amount to be proven at trial equal to the loss of affection, society, comfort, support, consortium and companionship of his wife.

### COUNT IX: GEORGIA RICO (RACKETEER INFLUENCE AND CORRUPT ORGANIZATIONS)
### (*All Defendants*)

190.    The Georgia RICO Act prohibits any person from engaging in certain enumerated activities through a pattern of racketeering or conspiracy.

191.    Defendants constitute an "enterprise" under O.C.G.A. § 16-14-3(3). Defendants' enterprise has, and has had, for all times relevant to this Complaint, a continuity of structure and a shared common purpose and scheme or pattern of hiding the dangerous environment created through emissions of EtO, which continuously invaded and contaminated the areas surrounding the Covington Facility.

192.    The Defendants were employed by or were associated with Defendant Bard as defined by O.C.G.A. § 16-14-4(b).

193.    Defendants are jointly and severally liable to Dr. Miller for this Racketeer Influenced and Corrupt Organization ("RICO") cause of action, and Defendants are each an agent of one another and a co-conspirator with the other relating to that acts alleged herein.

Copy from re:SearchGA

194.    Defendants agreed to enter into a conspiracy to violate Georgia law, including but not limited to O.G.C.A. § 16-14-3(5)(A) and 5(B).

195.    These offenses were part of a systematic and ongoing pattern of racketeering activity, which Defendants participated in directly through a pattern of racketeering activities.

196.    Through this behavior Defendants engaged in racketeering activities as defined in O.C.G.A. § 16-14-3(5)(B) and (5)(A) including, but not limited to, (xxii) false statements and concealment of facts, mail fraud, and wire fraud.

197.    Defendants' use and emission of EtO created a high degree of risk to those who live and work in the surrounding area. Further, the likelihood of cancer caused by Defendants' use and emission of EtO is significantly higher than the level of acceptable risk.

198.    Defendants knew, or should have known, that the levels of EtO gas emitting from the Covington Facility would have a toxic, poisonous, and deleterious effect upon the health, safety, and wellbeing of persons breathing it on a regular basis.

199.    As a result of public concern regarding the emissions of EtO at the Covington Facility, the City of Covington (the City) contracted for seven (7) days of ambient air monitoring in the area surrounding the Facility. The City notified Defendants, EPD, and the public of its plan before the air monitoring commenced. The City worked with Defendants and requested that Defendants put forth an official to certify daily that the company was conducting normal operations during the period of air monitoring. Defendants agreed to do so. The City's contractor conducted the air monitoring from September 17, 2019 through September 23, 2019.

200.    From September 17, 2019 through September 23, 2019, Defendants provided the City of Covington with the requested Affidavits certifying that the Facility was operating normally

43

Copy from re:SearchGA

during the seven-day test period. Specifically, Defendants certified that it was conducting its usual operations in accordance with its 2019 Standard Operating Procedures.

201.    The Affidavits were provided to the City by Defendants even though Defendants were intermittently releasing EtO into the atmosphere starting on September 15, 2019 - two days before the air monitoring commenced, through almost the entire monitoring period, which ended on September 23, 2019 - the day Defendants discovered the release. Defendants acted in bad faith in providing the Affidavits to the City because Defendants knew that it was experiencing an unauthorized release in violation of the Permit.

202.    By providing these Affidavits to the City despite having this knowledge, Defendants knowingly made false statements to the City of Covington.

203.    Despite Defendants' false statements to the contrary, EPD discovered that BD's fugitive emissions of nearly 55 pounds of EtO from the Covington Facility in less than one week's time violated the requirement to achieve 99% destruction removal efficiency. EPD also discovered that Defendants made false statements regarding Defendants' alleged compliance with release reporting requirements for EtO, which mandate the reporting of EtO releases in excess of 10 pounds in a 24-hour period.

204.    Defendants also made false and misleading statements to Governor Brian Kemp in an August 20, 2019 Letter drafted by Defendant Sam Kihichi, who serves as EVP General Counsel for Defendant BD. Namely, Defendant Kihichi claimed that Defendant BD Bard "invest[s] in and deploy[s] best available air pollution control technology at our facilities to achieve greater than 99.5% destruction of EtO in our plant stack emissions." However, despite claiming that Defendant BD Bard deploys the "best available air pollution control technology," Defendants had to order

44

Copy from re:SearchGA

and implement nearly $8 million in additional equipment and technology to bring its fugitive emissions control system up to current best standards. At the time of installation, this technology sought by BD Bard was already in use by others in the industry.

205.    On January 2, 2019 and May 3, 2019, Defendant LaMontagne sent letters to Georgia EPD through the U.S. Postal Service, which provided data regarding Defendants' compliance with the 99% EtO destruction efficiency required by their permit.

206.    The emissions data reported by Defendant LaMontagne failed to factor in fugitive emissions, which occur when EtO escapes from anywhere other than the facility's stack (which is the only area actually measured) and is not captured by pollution controls. In doing so, Defendant's letter made false and/or misleading representations regarding Defendants' EtO emissions and normal operating procedures. In so doing, Defendants utilized the United States mail to cover up the true extent of the Covington Facility's fugitive EtO emissions and EtO destruction efficiency.

207.    Defendants also sent numerous emails containing letters and attached exhibits, which provided data and other representations regarding Defendants' compliance with the 99% EtO destruction efficiency required by their permit. Because the emissions data reported by Defendants failed to factor in fugitive emissions, Defendants made false and/or misleading representations regarding Defendants' EtO emissions and normal operating procedures. In so doing, Defendants utilized wires to cover up the true extent of the Covington Facility's fugitive EtO emissions.

208.    Defendants were aware that these statements and representations were not true and misleading at the time they were made. This constitutes racketeering activity by the Defendants

Copy from re:SearchGA

which was part of a common and continuous pattern of fraudulent schemes, perpetrated for the same or similar purposes and constituting a "pattern of racketeering activity."

209.     Through racketeering activities, the Defendants deceived regulatory officials, and Dr. Miller was exposed to and inhaled carcinogenic amounts of EtO.

210.     As a proximate result of Dr. Miller's inhalation of EtO from the Covington Facility, Dr. Miller has suffered damages in the form of medical expenses, physical disability, mental and physical pain and suffering, extreme emotional distress, and other damages to be proven at trial.

## COUNT X: PUNITIVE DAMAGES
### *(All Defendants)*

211.     At all times relevant, Defendants owed a duty to refrain from willful and wanton misconduct and/or conduct which exhibited an indifference and/or conscious disregard to the health, safety, and well-being of Dr. Miller and those living and working in the area surrounding the Covington Facility.

212.     The conduct of each Defendant as set forth hereinabove showed willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of a conscious indifference to consequences.

213.     Accordingly, punitive damages should be imposed against each defendant pursuant O.C.G.A. § 51-12-5.1 and other applicable laws, to punish and deter each Defendant from repeating or continuing such unlawful conduct, in an amount to be proven at trial.

Copy from re:SearchGA

## COUNT X: ATTORNEY'S FEES AND EXPENSES OF LITIGATION
### *(All Defendants)*

214.    Defendants' actions constitute willful, intentional, and tortious conduct. Every intentional tort involves an element of bad faith that entitles a person to recover the expenses of litigation, including attorney's fees.

215.    The actions of Defendants and their agents and representatives have caused Plaintiffs unnecessary trouble and expense.

216.    Plaintiffs are entitled to recover their attorney's fees and the expense of litigation from the Defendants pursuant to O.C.G.A. § 13-6-11.

**WHEREFORE, Plaintiffs pray**:

a.  That process issue according to law;

b.  That each Defendant be served with a copy of Plaintiffs' Complaint and show cause why the prayers for relief requested by Plaintiffs herein should not be granted;

c.  That Plaintiffs be granted a trial by jury in this matter;

d.  That the Court enter a judgment against each Defendant for all general and compensatory damages allowable to Plaintiffs;

e.  That the Court enter a judgment against each Defendant for all special damages allowable to Plaintiffs;

f.  That the Court enter a judgment against each Defendant for treble damages allowable to Plaintiffs under Georgia RICO law;

g.  That the Court enter a judgment against each Defendant serving to award Plaintiffs punitive damages under the provisions of O.C.G.A. § 51-12-5.1 and as otherwise provided by law;

47

Copy from re:SearchGA

h. That the Court enter a judgment against each Defendant for all other relief sought by Plaintiffs under this Complaint;

i. That the costs of this action be cast upon Defendants; and

j. That the Court grant Plaintiffs such further relief which the Court deems just and appropriate.

Respectfully submitted this 8th day of September, 2020.

**PENN LAW LLC**

*/s/ Darren W. Penn*
DARREN W. PENN
Georgia Bar No. 571322
darren@pennlawgroup.com
WILLIAM L. BALLARD
Georgia Bar No. 035625
bill@pennlawgroup.com
SCOTT M. PATTERSON
Georgia Bar No. 566718
scott@pennlawgroup.com
ALEXANDRA "SACHI" COLE
Georgia Bar No. 696892
sachi@pennlawgroup.com
KEVIN M. KETNER
Georgia Bar No. 418233
kevin@pennlawgroup.com

4200 Northside Parkway, NW
Building One, Suite 100
Atlanta, Georgia 30327
Phone/Fax: (404) 961-7655

Copy from re:SearchGA

**PERMIT NO. 3841-217-0021-S-04-0**
**ISSUANCE DATE: December 27, 2018**



# GEORGIA
### DEPARTMENT OF NATURAL RESOURCES

## ENVIRONMENTAL PROTECTION DIVISION

## Air Quality Permit

In accordance with the provisions of the Georgia Air Quality Act, O.C.G.A. Section 12-9-1, et seq and the Rules, Chapter 391-3-1, adopted pursuant to and in effect under that Act,

| | |
|---|---|
| **Facility Name:** | **BD (Becton, Dickinson and Company)** |
| **Facility Address:** | **8195 Industrial Boulevard** |
| | **Covington, Georgia 30014, Newton County** |
| **Mailing Address:** | **8195 Industrial Boulevard** |
| | **Covington, Georgia 30014** |
| **Facility AIRS Number:** | **04-13-217-00021** |

is issued a Permit for the following:

**The operation of an ethylene oxide sterilization facility.**
**This Permit is issued for the purpose of establishing practically enforceable emission limitations such that the facility will not be considered a major source with respect to Title V of the Clean Air Act Amendments of 1990.**

This Permit is conditioned upon compliance with all provisions of The Georgia Air Quality Act, O.C.G.A. Section 12-9-1, et seq, the Rules, Chapter 391-3-1, adopted and in effect under that Act, or any other condition of this Permit.

This Permit may be subject to revocation, suspension, modification or amendment by the Director for cause including evidence of noncompliance with any of the above; or for any misrepresentation made in Application No. 26803 dated October 29, 2018; any other applications upon which this Permit is based; supporting data entered therein or attached thereto; or any subsequent submittals or supporting data; or for any alterations affecting the emissions from this source.

This Permit is further subject to and conditioned upon the terms, conditions, limitations, standards, or schedules contained in or specified on the attached **7** pages.



[Signed]

_____
Richard E. Dunn, Director
Environmental Protection Division



EXHIBIT
A

Copy from re:SearchGA

**State of Georgia**
**Department of Natural Resources**
**Environmental Protection Division**

Permit No.                                                                                              **Page 1 of 7**
**3841-217-0021-S-04-0**

## 1. General Requirements

1.1   At all times, including periods of startup, shutdown, and malfunction, the Permittee shall maintain and operate this source, including associated air pollution control equipment, in a manner consistent with good air pollution control practice for minimizing emissions. Determination of whether acceptable operating and maintenance procedures are being used will be based on information available to the Division which may include, but is not limited to, monitoring results, opacity observations, review of operating and maintenance procedures, and inspection or surveillance of the source.

1.2   The Permittee shall not build, erect, install or use any article, machine, equipment or process the use of which conceals an emission which would otherwise constitute a violation of an applicable emission standard. Such concealment includes, but is not limited to, the use of gaseous diluents to achieve compliance with an opacity standard or with a standard that is based on the concentration of a pollutant in the gases discharged into the atmosphere.

1.3   The Permittee shall submit a Georgia Air Quality Permit application to the Division prior to the commencement of any modification, as defined in 391-3-1-.01(pp), which may result in air pollution and which is not exempt under 391-3-1-.03(6). Such application shall be submitted sufficiently in advance of any critical date involved to allow adequate time for review, discussion, or revision of plans, if necessary. The application shall include, but not be limited to, information describing the precise nature of the change, modifications to any emission control system, production capacity and pollutant emission rates of the plant before and after the change, and the anticipated completion date of the change.

1.4   Unless otherwise specified, all records required to be maintained by this Permit shall be recorded in a permanent form suitable for inspection and submission to the Division and shall be retained for at least five (5) years following the date of entry.

1.5   In cases where conditions of this Permit conflict with each other for any particular source or operation, the most stringent condition shall prevail.

## 2. Allowable Emissions

2.1   The Permittee shall comply with all applicable provisions of the National Emission Standard for Hazardous Air Pollutants (NESHAP) as found in 40 CFR Part 63 Subpart O, "Ethylene Oxide Emission Standards from Sterilization Facilities" for the operation of the ethylene oxide sterilization equipment.
[40 CFR 63 Subpart O; 40 CFR 63.360]

2.2   The Permittee shall comply with all applicable provisions of 40 CFR Part 63 Subpart A – "General Provisions" as specified in Table 1 of 40 CFR 63 Subpart O.
[40 CFR 63 Subpart A; 40 CFR 63.360]

Copy from re:SearchGA

**State of Georgia**
**Department of Natural Resources**
**Environmental Protection Division**

Permit No.                                                                                      **Page 2 of 7**
**3841-217-0021-S-04-0**

2.3    The ethylene oxide emissions to the atmosphere from each sterilizer chamber vent shall be reduced by at least 99%.
[40 CFR 63 Subpart O; 40 CFR 63.362(c); 40 CFR 70 Avoidance for HAP and VOC]

2.4    The Permittee shall either reduce ethylene oxide emissions from each aeration room vent to 1 ppm by volume or less or by at least 99%.
[40 CFR 63 Subpart O; 40 CFR 63.362(d); 40 CFR 70 Avoidance for HAP and VOC]

2.5    The emission limitations of Condition Nos. 2.3. and 2.4 apply during sterilization operation. The emission limits do not apply during periods of malfunction.
[40 CFR 63 Subpart O; 40 CFR 63.362(b)]

2.6    The Permittee shall comply with the emissions limitations of 40 CFR Part 63, Subpart O as follows:
[40 CFR 63 Subpart O; 40 CFR 63.360(g)]

    a.    All sterilization chamber vents with an initial startup date after December 6, 1998 shall comply immediately upon initial startup of the source.

    b.    All aeration room vents with an initial startup date on or after December 6, 2000, shall comply immediately upon initial startup of the source.

## 3.   Fugitive Emissions

3.1    The Permittee shall take all reasonable precautions with any operation, process, handling, transportation, or storage facilities to prevent fugitive emissions of air contaminants.

## 4.   Process & Control Equipment

4.1    The Permittee shall operate the Regenerative Thermal Oxidizer (RTO-1) at or above 1447 degrees Fahrenheit (or a new minimum oxidation temperature approved in writing by the Division), except during periods of startup, shutdown, or malfunction. An operating parameter deviation is defined as any 24-hour average of the oxidation temperature for the Regenerative Thermal Oxidizer (RTO-1) that is below 1447 degrees Fahrenheit (or a new minimum oxidation temperature approved in writing by the Division). The Permittee may establish a new minimum oxidation temperature based on performance testing and that is at least equal to or higher than the recommended minimum oxidation temperature provided by the Regenerative Thermal Oxidizer (RTO-1) manufacturer.
[40 CFR 63 Subpart O; 40 CFR 63.363(b)(3), 40 CFR 63.363(f)]

4.2    Routine maintenance shall be performed on all air pollution control equipment. Maintenance records shall be recorded in a permanent form suitable and available for inspection by the Division. The records shall be retained for at least five years following the date of such maintenance.

Copy from re:SearchGA

**State of Georgia**
**Department of Natural Resources**
**Environmental Protection Division**

Permit No.                                                                                 **Page 3 of 7**
3841-217-0021-S-04-0

4.3   A spare parts inventory for control equipment shall be maintained by the Permittee.

4.4   Malfunctioning components of air pollution control systems shall be repaired as expeditiously as possible.

## 5. Monitoring

5.1   The Permittee shall either continuously monitor and record the oxidation temperature using the temperature monitor(s) described in Condition No. 5.2 or measure and record the ethylene oxide concentration in accordance with 40 CFR 63.364(e). Monitoring is required only when the Regenerative Thermal Oxidizer (RTO-1) is operated.
[40 CFR 63 Subpart O; 40 CFR 63.364(c)]

5.2   The Permittee shall install, calibrate, maintain, and operate a system to continuously monitor and record the oxidation temperature as determined from the average reading of the three combustion chamber temperature sensors on the Regenerative Thermal Oxidizer (RTO-1). Monitoring is required only when Regenerative Thermal Oxidizer (RTO-1 is operated.  The temperature monitor shall be accurate within ±5.6 degrees Celsius (± 10 degrees Fahrenheit). Where such performance specification(s) exist, each system shall meet the applicable performance specification(s) of the Division's monitoring requirements.
[40 CFR 63 Subpart O; 40 CFR 63.364(c)]

5.3   The Permittee shall verify the accuracy of the temperature monitor required by Condition No. 5.2 twice each calendar year with a reference temperature monitor (traceable to National Institute of Standards and Technology (NIST) standards or an independent temperature measurement device dedicated for this purpose).  During accuracy checking, the probe of the reference device shall be at the same location as that of the temperature monitor being tested. As an alternative, the accuracy temperature monitor may be verified in a calibrated oven (traceable to NIST standards)
[40 CFR 63 Subpart O; 40 CFR 63.364(c)(4)]

5.4   Any monitoring system installed by the Permittee shall be in continuous operation except during calibration checks, zero and span adjustments or periods of repair.  Maintenance or repair shall be conducted in the most expedient manner to minimize the period during which the system is out of service.

5.5   The Permittee shall provide and maintain a spare parts inventory for any monitoring system installed.  A list of parts to be kept in inventory shall be kept in a form suitable for inspection by the Division for no less than five years.

Copy from re:SearchGA

**State of Georgia**
**Department of Natural Resources**
**Environmental Protection Division**

Permit No.
3841-217-0021-S-04-0

### 6. Performance Testing

6.1    The Permittee shall cause to be conducted a performance test at any specified emission point when so directed by the Division. The following provisions shall apply with regard to such tests:

     a.    All tests shall be conducted and data reduced in accordance with applicable procedures and methods specified in the Division's Procedures for Testing and Monitoring Sources of Air Pollutants.

     b.    All test results shall be submitted to the Division within sixty (60) days of the completion of testing.

     c.    The Permittee shall provide the Division thirty (30) days prior written notice of the date of any performance test(s) to afford the Division the opportunity to witness and/or audit the test, and shall provide with the notification a test plan in accordance with Division guidelines.

     d.    All monitoring systems and/or monitoring devices required by the Division shall be installed, calibrated and operational prior to conducting any performance test(s). For any performance test, the Permittee shall, using the monitoring systems and/or monitoring devices, acquire data during each performance test run. All monitoring system and/or monitoring device data acquired during the performance testing shall be submitted with the performance test results.

6.2    In accordance with 40 CFR 63.7(b) and 63.9(e), the Permittee shall notify the Division of intent to conduct a performance test at least 60 calendar days before the performance test is scheduled to begin. If the test must be rescheduled due to unforeseeable circumstances beyond his control, the Permittee shall notify the Division within five (5) days prior to the scheduled date of the test and shall specify the date when the test is rescheduled.

6.3    In accordance with 40 CFR 63.7(c)(4), the Permittee shall analyze performance audit samples during each performance test.

6.4    The Permittee shall provide performance testing facilities as specified in 40 CFR 63.7(d). Performance tests shall be conducted under conditions based on representative performance of the source and as otherwise specified in 40 CFR 63.7(e).

6.5    In accordance with 40 CFR 63.7(c)(2), the Permittee shall submit a site-specific test plan along with the Notification of Intent to conduct a performance test.

6.6    In accordance with 40 CFR 63.7(g), 63.9(h), 63.10(d), and 63.366(a), the Permittee shall submit the results of a performance test within 60 days following completion of the test.

**State of Georgia**
**Department of Natural Resources**
**Environmental Protection Division**

**Permit No.**                                                                                      **Page 5 of 7**
**3841-217-0021-S-04-0**

## 7. Notification, Reporting and Record Keeping Requirements

7.1   The Permittee shall maintain records of the occurrence and duration of any startup, shutdown, or malfunction in the operation of an affected facility, any malfunction of the air pollution control equipment or any periods during which a continuous monitoring system or monitoring device is inoperative.  The Permittee shall retain these records for a period of at least five (5) years after the date of any such startup, shutdown, or malfunction.

7.2   The Permittee shall maintain a file of all measurements, including continuous monitoring system, monitoring device, and performance testing measurements; all continuous monitoring system performance evaluations; all continuous monitoring system or monitoring device calibration checks; adjustments and maintenance performed on these systems or devices; and all other information required by this Permit.  The information shall be recorded in a permanent form suitable and available for inspection and shall be retained for at least five (5) years following the date of such measurements maintenance, reports, and records.

7.3   The data acquisition system for the temperature monitors required by Condition No. 5.2 shall compute and record a daily average oxidation temperature from the 15-minute or shorter period temperature values.   Strip chart data shall be converted to record a daily average oxidation temperature for each day any instantaneous temperature recording falls below the minimum temperature.
[40 CFR 63 Subpart O; 40 CFR 63.364(c)]

7.4   The Permittee shall maintain files of all information required by this permit or by 40 CFR 63 in a form suitable and available for expeditious inspection and review for at least five years following date of entry in accordance with 40 CFR 63.10(b)(1).

7.5   The Permittee shall maintain General records and CMS records as specified by 40 CFR 63.10(b)(2) and (c), respectively, and Table 1 of 40 CFR 63 Subpart O.

7.6   In accordance with 40 CFR 63.10, 63.366(a), and Table 1 of 40 CFR 63 Subpart O, the Permittee shall submit the following reports:

a.     Deviation reports; and

b.     Continuous Monitoring System performance and summary reports

Contents and submittal dates for Deviation and Continuous Monitoring System Performance Reports shall be as specified in 40 CFR 63.366(a)(3).

**State of Georgia**
**Department of Natural Resources**
**Environmental Protection Division**

Permit No.                                                                                                          Page 6 of 7
3841-217-0021-S-04-0

7.7   The Permittee shall submit a written report containing any excess emissions, exceedances, and/or excursions as described in this permit and any monitor malfunctions for each semiannual period ending June 30th and December 31st of each year.  All reports shall be postmarked by the 30th day following the end of each reporting period, July 30th and January 30th.  In the event that there have not been any excess emissions, exceedances, excursions, or malfunctions during a reporting period, the report should so state.  Otherwise, the contents of each report shall be as specified by the Division's Procedures for Testing and Monitoring Sources of Air Pollutants and shall contain the following:
[391-3-1-.02(6)(b)1,  40 CFR 63.10(e)]

a.   A summary report of excess emissions, exceedances and excursions, and monitor downtime, in accordance with Section 1.5(c) and (d) of the above referenced document, including any failure to follow required work practice procedures.

b.   Total process operating time during each reporting period.

c.   The magnitude of all excess emissions, exceedances and excursions computed in accordance with the applicable definitions as determined by the Director, and any conversion factors used, and the date and time of the commencement and completion of each time period of occurrence.

d.   Specific identification of each period of such excess emissions, exceedances, and excursions that occur during startups, shutdowns, or malfunctions of the affected facility.  Include the nature and cause of any malfunction (if known), the corrective action taken or preventive measures adopted.

e.   The date and time identifying each period during which any required monitoring system or device was inoperative (including periods of malfunction) except for zero and span checks, and the nature of the repairs, adjustments, or replacement.  When the monitoring system or device has not been inoperative, repaired, or adjusted, such information shall be stated in the report.

f.   Certification by a Responsible Official that based on information and belief formed after reasonable inquiry, the statements and information in the report are true, accurate, and complete.

Copy from re:SearchGA

**State of Georgia**
**Department of Natural Resources**
**Environmental Protection Division**

Permit No.                                                                              Page 7 of 7
3841-217-0021-S-04-0

## 8. Special Conditions

8.1   At any time that the Division determines that additional control of emissions from the facility may reasonably be needed to provide for the continued protection of public health, safety and welfare, the Division reserves the right to amend the provisions of this Permit pursuant to the Division's authority as established in the Georgia Air Quality Act and the rules adopted pursuant to that Act.

8.2   The Permittee shall calculate and pay an annual Permit fee to the Division.  The amount of the fee shall be determined each year in accordance with the "Procedures for Calculating Air Permit Fees."

8.3   Georgia Air Quality Permit No. 3841-217-0021-S-03-0, is hereby revoked in its entirety.

Copy from re:SearchGA



**GEORGIA**
DEPARTMENT OF NATURAL RESOURCES

**ENVIRONMENTAL PROTECTION DIVISION**

**Richard E. Dunn, Director**

**Air Protection Branch**
4244 International Parkway
Suite 120
Atlanta, Georgia 30354
404-363-7000

## MEMORANDUM

June 7, 2019

**To:**      James Boylan
**Thru:**    Byeong-Uk Kim
**From:**    Yan Huang
**Subject:** **Modeling Analysis for Ethylene Oxide**
             **Becton Dickinson (formerly, C. R. Bard), Covington, Newton County, GA**

## GENERAL INFORMATION

As part of a review on the EPA 2014 National Air Toxics Assessment (NATA), air dispersion modeling of ethylene oxide was conducted by the Georgia Environmental Protection Division (GA EPD) to assess the impacts of ethylene oxide emissions from Becton Dickinson (AIRS# 21700021) on ambient air surrounding the facility. Although this modeling analysis is not for issuance of a permit, GA EPD adopted procedures described in GA EPD's *Guideline for Ambient Impact Assessment of Toxic Air Pollutant Emissions*[1].

This memo discusses modeling results including the procedures used to develop the dispersion modeling. Becton Dickinson sterilizes packaged medical equipment shipped from other locations using ethylene oxide. After sterilization, the ethylene oxide is displaced with air and vented to a regenerative thermal oxidizer (RTO) and 14 exhaust fans. The air toxic impacts from ethylene oxide emissions was below its Acceptable Ambient Concentration (AAC) at the 15-min averaging period, but exceeded its annual AAC. Site-specific risk assessments were performed at five nearby residential areas and the modeled ground-level concentrations exceeded the annual AAC at all five residential areas. The results are summarized in the following sections of this memorandum.

## INPUT DATA

1. **Meteorological Data** – Hourly meteorological data (2014 to 2018) used in this review were generated by GA EPD (http://epd.georgia.gov/air/georgia-aermet-meteorological-data). Surface measurement obtained from the Hartsfield-Jackson Atlanta Airport at Atlanta, GA. Upper air observations were obtained from the Atlanta Regional Airport – Falcon Field at Peachtree City, GA. These measurements were processed using the AERSURFACE (v13016), AERMINUTE (v15272), and AERMET (v18081) with the adjusted surface friction velocity option (ADJ_U*).

2. **Source Data** – Emission release parameters and emission rates were provided by the company and reviewed by the GA EPD Stationary Source Permitting Program. The point source emissions are exhausted from the facility's stack connected to an RTO, and the non-point fugitive emissions are exhausted from a total of 14 exhaust fans. Based on Becton Dickinson's submittal, the ethylene oxide

---

1   https://epd.georgia.gov/air/documents/toxics-impact-assessment-guideline



EXHIBIT
B

Copy from re:SearchGA

annual emissions in 2017 were 101.7 lbs from the RTO and 555.7 lbs from the 14 exhaust fans (see Appendix A for details).

3. **Receptor Locations** – Discrete receptors with 25-meter intervals were placed on a Cartesian grid along the fence-line. Receptors extend outwards from the fence-line at 100-meter intervals to approximately 2 kilometers, at 250-meter intervals to approximately 5 kilometers, and at 500-meter to approximately 12.5 kilometers. This domain (25 km by 25 km) is sufficient to capture the maximum impact. Additional receptors were placed at five nearby residential areas. The nearest residence is located approximately 270 meters east of the facility. All receptor locations are represented in the Universal Transverse Mercator (UTM) projections, Zone 17, North American Datum 1983.

4. **Terrain Elevation** – Topography was found to be generally flat in the site vicinity. Terrain data from USGS 1-sec National Elevation Dataset (NED) were extracted to obtain the elevations of all sources and receptors by the AERMAP terrain processor (v18081).

5. **Building Downwash** – The potential effect for building downwash was evaluated via the "Good Engineering Practice (GEP)" stack height analysis and was based on the scaled site plan submitted by the facility using the BPIPPRM program (version 04274). The BPIPPRM model was used to derive building dimensions for downwash assessment and the assessment of cavity-region concentrations appropriate for the AERMOD model.

## AIR TOXICS ASSESSMENT

The impacts of facility-wide ethylene oxide emissions were evaluated according to the Georgia Air Toxics Guideline available at https://epd.georgia.gov/air/documents/toxics-impact-assessment-guideline. The annual and 15-minute AACs were reviewed based on U.S. EPA Integrated Risk Information System (IRIS) Risk Based Air Concentration (RBAC) and OSHA Permissible Exposure Limit (PEL) according to the Georgia Air Toxics Guideline (see Appendix B for details). The EPA NATA used a different annual AAC value (see Appendix C for details). For this assessment, GA EPD used the annual AAC derived according to the Georgia Air Toxics Guideline and took two approaches to evaluate the impacts. The first approach (described in the Georgia Air Toxics Guideline) selects the year with the highest annual modeled maximum ground-level concentrations (MGLC) from the 5-year modeling period and uses this year in the assessment. The second approach calculates the maximum annual modeled concentrations averaged over the 5-year modeling period. The modeled 1-hour and annual ground-level concentrations were calculated using the AERMOD dispersion model (v18081).

### Analysis with the Highest 5-Year MGLCs

Table 1 summarizes the AAC levels and the MGLCs from the year with the highest value. The 15-min MGLC is based on the 1-hour MGLC multiplied by a factor of 1.32. The 15-min MGLC was below its corresponding 15-min AAC. However, the annual MGLC exceeded the annual AAC. Figure 1 shows the spatial distributions of ground level concentrations with the 2015 meteorological data (the year with the highest MGLC). Figure 2 shows a close-up look of modeled concentrations centered at the facility with the five nearby residential areas labeled. The MGLCs of the five closest residences are shown in Table 2. The areas inside the green lines indicate that the MGLC exceeds the ethylene oxide AAC annual level.

2

Copy from re:SearchGA

**Table 1. Modeled highest 5-year MGLCs and the Respective AACs.**

| Averaging period | MGLC (µg/m³)* | AAC (µg/m³) |
|---|---|---|
| Annual | 0.163 | 0.00033 |
| 15-min | 3.688 | 900 |

\* The highest concentration over all averaging periods was modeled in 2015.



**Figure 1.** Contours of annual average ground-level concentrations overlaid on a Google Earth map for 2015 (the year with the highest modeled MGLC).

Copy from re:SearchGA



**Figure 2.** A close-up look of Figure 1 with the closest residential areas labeled.

**Table 2. Risk Analysis for Residential Areas with Modeled highest 5-year MGLCs.**

| Residential Areas | Receptor UTM Zone:17 | | MGLC (µg/m³)* | Averaging Period | AAC (µg/m³) | Ratio of MGLC (µg/m³) to AAC (µg/m³) |
|---|---|---|---|---|---|---|
| | Easting (meter) | Northing (meter) | | | | |
| R1 | 236,932.5 | 3,722,361.2 | 0.032 | Annual | 0.00033 | 97 |
| R2 | 236,137.9 | 3,721,995.0 | 0.011 | Annual | 0.00033 | 34 |
| R3 | 236,163.0 | 3,721,885.6 | 0.008 | Annual | 0.00033 | 23 |
| R4 | 237,343.8 | 3,721,603.8 | 0.012 | Annual | 0.00033 | 38 |
| R5 | 235,611.0 | 3,722,319.2 | 0.014 | Annual | 0.00033 | 42 |

\* The highest concentration over all averaging periods was modeled in 2015.

## Analysis with 5-Year Average Ground-level Concentrations

To further assess the impact over longer period, maximum values from the 5-year averaged ground-level concentrations are summarized in Table 3. Contours of modeled annual ground-level concentrations averaged over the 5-year period are shown in Figure 3. Figure 4 shows a close-up look centered at the facility with the five nearby residential areas labeled. The 5-year averaged modeled ground-level concentrations of the five nearby residential areas are shown in Table 4.

Copy from re:SearchGA

**Table 3. Modeled Maximum 5-year Annual Average Ground-level Concentrations and the Respective AAC.**

| Averaging period | MGLC ($\mu g/m^3$)* | AAC ($\mu g/m^3$) |
|---|---|---|
| Annual | 0.144 | 0.00033 |

\* The maximum of ground-level concentration averaged over 5 years.



**Figure 3.** Contours of 5-year annual average ground-level concentrations modeled overlaid on a Google Earth map.

5



**Figure 4.** A close-up look of Figure 3 with the closest residential areas labeled.

**Table 4. Risk Analysis for Residential Areas with 5-year Average Ground-level Concentrations.**

| Residential Areas | Receptor UTM Zone: 17 | | MGLC ($\mu g/m^3$)* | Averaging Period | AAC ($\mu g/m^3$) | Ratio of Ground-level Concentration ($\mu g/m^3$) to AAC ($\mu g/m^3$) |
|---|---|---|---|---|---|---|
| | Easting (meter) | Northing (meter) | | | | |
| R1 | 236,932.5 | 3,722,361.2 | 0.028 | Annual | 0.00033 | 84 |
| R2 | 236,137.9 | 3,721,995.0 | 0.009 | Annual | 0.00033 | 27 |
| R3 | 236,163.0 | 3,721,885.6 | 0.006 | Annual | 0.00033 | 17 |
| R4 | 237,343.8 | 3,721,603.8 | 0.010 | Annual | 0.00033 | 32 |
| R5 | 235,611.0 | 3,722,319.2 | 0.012 | Annual | 0.00033 | 35 |

## CONCLUSIONS

The dispersion modeling analysis for ethylene oxide shows exceedances at the annual AAC level with the revised 2017 emissions submitted by the facility.  The risk assessment indicates that the ethylene oxide concentrations at the nearby residential areas are well above the AAC level (17-97 times).

Copy from re:SearchGA

# Appendix A

Revised Emissions for Year 2017 and Model Input Parameters

Copy from re:SearchGA

## Ethylene Oxide (EtO) Emissions

| Emission Source | 2017 EtO Emissions (lb/yr) |
|---|---|
| RTO | 101.7 |
| Fugitives | 555.7 |

## Model Input Parameters for EtO Emissions Sources

| Model ID | Stack Description | Source Type | UTM E¹ (m) | UTM N¹ (m) | Emis % | Modeled EtO Emissions³ (g/s) | Stack Height | | Stack Temperature | | Exhaust Gas Flow Rate (cfm) | Exit Velocity | | Stack Diameter | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (ft) | (m) | (°F) | (K) | | (ft/s) | (m/s) | (inch) | (m) |
| EF17 | Exhaust Fan | POINT | 236,448.9 | 3,722,282.1 | 4% | 3.197E-04 | 30.0 | 9.144 | 70 | 294.26 | 10,000 | 34.0 | 10.363 | 30.0 | 0.762 |
| EF18 | Exhaust Fan | POINT | 236,450.5 | 3,722,304.2 | 4% | 3.197E-04 | 30.0 | 9.144 | 70 | 294.26 | 10,000 | 34.0 | 10.363 | 30.0 | 0.762 |
| EF20 | Exhaust Fan | POINT | 236,452.0 | 3,722,280.9 | 4% | 3.197E-04 | 30.0 | 9.144 | 70 | 294.26 | 10,000 | 34.0 | 10.363 | 30.0 | 0.762 |
| EF21 | Exhaust Fan | POINT | 236,473.6 | 3,722,300.3 | 4% | 3.197E-04 | 30.0 | 9.144 | 70 | 294.26 | 10,000 | 34.0 | 10.363 | 30.0 | 0.762 |
| EF22 | Exhaust Fan | POINT | 236,485.7 | 3,722,302.2 | 10% | 7.993E-04 | 36.0 | 10.973 | 70 | 294.26 | 24,000 | 37.9 | 11.552 | 44.0 | 1.118 |
| EF23 | Exhaust Fan | POINT | 236,489.1 | 3,722,324.3 | 10% | 7.993E-04 | 25.0 | 7.620 | 70 | 294.26 | 24,000 | 36.2 | 11.034 | 45.0 | 1.143 |
| EF24 | Exhaust Fan | POINT | 236,487.8 | 3,722,345.4 | 10% | 7.993E-04 | 25.0 | 7.620 | 70 | 294.26 | 24,000 | 36.2 | 11.034 | 45.0 | 1.143 |
| EF25 | Exhaust Fan | POINT | 236,470.2 | 3,722,347.0 | 10% | 7.993E-04 | 25.0 | 7.620 | 70 | 294.26 | 24,000 | 36.2 | 11.034 | 45.0 | 1.143 |
| EF26 | Exhaust Fan | POINT | 236,449.8 | 3,722,348.7 | 10% | 7.993E-04 | 25.0 | 7.620 | 70 | 294.26 | 24,000 | 36.2 | 11.034 | 45.0 | 1.143 |
| EF44* | Exhaust Fan | POINT | 236,432.1 | 3,722,277.0 | 5% | 3.996E-04 | 28.0 | 8.534 | 70 | 294.26 | 13,200 | 40.0 | 12.192 | 31.8 | 0.808 |
| EF45* | Exhaust Fan | POINT | 236,433.7 | 3,722,301.4 | 5% | 3.996E-04 | 28.0 | 8.534 | 70 | 294.26 | 13,200 | 40.0 | 12.192 | 31.8 | 0.808 |
| EF47 | Exhaust Fan | POINT | 236,429.5 | 3,722,320.3 | 8% | 6.394E-04 | 25.0 | 7.620 | 70 | 294.26 | 21,200 | 33.5 | 10.211 | 44.0 | 1.118 |
| EF48 | Exhaust Fan | POINT | 236,431.1 | 3,722,342.5 | 8% | 6.394E-04 | 25.0 | 7.620 | 70 | 294.26 | 21,200 | 33.5 | 10.211 | 44.0 | 1.118 |
| EF49 | Exhaust Fan | POINT | 236,445.2 | 3,722,348.8 | 8% | 6.394E-04 | 25.0 | 7.620 | 70 | 294.26 | 21,200 | 33.5 | 10.211 | 44.0 | 1.118 |
| RTO | regenerative thermal oxidizer | POINT | 236,424.2 | 3,722,295.0 | N/A | 1.463E-03 | 50.0 | 15.240 | 250 | 394.26 | 23,000 | 30.5 | 9.296 | 48.0 | 1.219 |

Notes:
1. Coordinates reflect UTM NAD83, Zone 17. EF20 coordinates were revised based on site plan
2. EF44 and EF45 - Roof mounted upblast type fan, modeled diameters were derived from flow rate and exit velocity
3. EF25/26 - Rectangular Ducts shown as the round equivalent

8

Copy from re:SearchGA

# Appendix B

## GA EPD Calculation of the Annual and 15-min AAC for Ethylene Oxide

Copy from re:SearchGA

## GA EPD Calculation of the Annual and 15-min AAC for Ethylene Oxide

According to the GA EPD's *Guideline for Ambient Impact Assessment of Toxic Air Pollutant Emissions*, the annual and 15-min AAC for ethylene oxide are calculated as following:

### Annual AAC

In the EPA Integrated Risk Information System (IRIS), the Inhalation Unit Risk (IUR) for ethylene oxide is $3 \times 10^{-3}$ µg/m³. Since ethylene oxide is carcinogenic to humans, it belongs to Group A[2] with a cancer risk of 1/1,000,000. Therefore, the annual AAC is calculated as:

$$\text{Annual AAC} = \text{cancer risk} / \text{IUR} = (1/1{,}000{,}000)/(0.003 \text{ µg/m}^3) = \textbf{0.00033 µg/m}^3$$

### 15-min AAC

The OSHA permissible exposure limit (PEL) for ethylene oxide is 5 ppm. To convert the PEL from ppm to mg/m³, use the following conversion formula from the guidance:

$$(5 \text{ ppm} \times 44.05 \text{ g/mol}) / (24.45 \text{ L/mol}) = 9 \text{ mg/m}^3$$

where, 44.05 is the molecular weight for ethylene oxide and 24.45 is the molar volume at 25°C and 760 mmHg. After applying a safety factor of 10 for acute sensory irritants, the 15-min AAC is calculated as:

$$15\text{-min AAC} = 9 \text{ mg/m}^3 \times 1000 \text{ (convert mg to µg)} / 10 \text{ (safety factor)} = \textbf{900 µg/m}^3$$

---

[2] https://www.epa.gov/fera/risk-assessment-carcinogenic-effects

Copy from re:SearchGA

# Appendix C

EPA Calculation of the Annual AAC
for Ethylene Oxide

Copy from re:SearchGA

## EPA Calculation of the Annual AAC for Ethylene Oxide

According to EPA's IRIS, inhalation unit risk (IUR) for ethylene oxide (EtO) is $3x10^{-3}$ per $\mu g/m^3$ (as discussed in Appendix C). However, because of the elevated risk due to the mutagenic mode of action through early-life exposures, EPA multiplied the IUR by 1.6:

Modified IUR for EtO = $3x10^{-3}$ per $\mu g/m^3$ x 1.6 = $0.005/\mu g/m^3$

EPA's NATA used (100/1,000,000) individual risk for the purpose of determining "acceptable risk" (AR) in their national assessment.

AR Exposure Concentration = Cancer Risk / IUR = (100/1,000,000)/(0.005/$\mu g/m^3$) = **0.02 $\mu g/m^3$**

However, EPA uses (1/1,000,000) individual risk to incorporate an "ample margin of safety" (AMS) for setting emission standards[3] (e.g., benzene NESHAP).

AMS Exposure Concentration = Cancer Risk / IUR = (1/1,000,000)/(0.005/$\mu g/m^3$) = **0.0002 $\mu g/m^3$**

---

[3] https://www3.epa.gov/ttn/atw/rrisk/risk_rep.pdf

12

Copy from re:SearchGA

# Incident Report

**Completed by:**   John LaMontagne

**Date:**      27 September 2019

**Location of Incident:**  BD
          8195 Industrial Blvd.
          Covington GA 30014

**Release Point:**    Vessel 5 vacuum pump exhaust stack.
          ~ 10 ft. above roof.

**Date of Incident:**   15-23 September 2019

## Description of Incident:

Starting on 15 September 2019 the Covington sterilization operation began experiencing intermittent elevated Ethylene Oxide (EO) levels as reported on the Indoor Ambient Air Monitoring System (Baseline). All elevated instances were investigated and with no root cause initially found, after area inspections and system checks.

On 23 September 2019 it was discovered that the Vacuum Exhaust Valve for the Covington Line 5 Sterilizer was not in the fully closed position. It is believed that the elevated levels were a result of the valve not being fully closed.

The valve was put in the fully closed position and tested to verify it was completely closed. All other vessels were checked, and the correct valve position was verified.

## Background:

- 06 September 2019 a Change Control Request (CCR14-19) was initiated to route all vacuum pump exhaust to the Emission Control Device. The current configuration was to route vacuum pump exhaust from the Nitrogen Dilution phases of the cycle to atmosphere via a pipe that extended above the roof. The change involved removing the automated actuator and was made to simplify the system and eliminate a potential point of failure.

- The change was implemented on all Covington Sterilizers on 13 September 2019 via Work Order CV19-168. After the change routine operation resumed on 14 September 19.

  On 15 September 2019 the facility started experiencing elevated Baseline readings. Levels were in the 1 to 32 ppm range at various locations inside the building. Elevated levels were intermittent in nature.



Copy from re:SearchGA

- On 23 September the investigation determined that the Vacuum Exhaust Valve was not fully closed. The valve was 180 degrees counterclockwise from the fully closed position.  The valve position was immediately corrected.

## Root Cause Investigation:

Investigation has determined that elevated levels were a result of the valve not being in the fully closed position.  EO was exhausting from the vacuum pump exhaust stack and entering the building through roof mounted ventilation intakes.

The valve actuator had been removed and the technician manually operated the valve to what he believed was the closed position.  This valve has no indication to visually determine if it is in the fully closed position.  The technician turned the valve so that the flat part of the stem was perpendicular to the pipe.  This would typically indicate a closed position. This particular valve design requires that the stem be rotated in the clockwise direction to close. This valve style is unique to Vessel #5. The butterfly valves on the other Covington Vessels can be rotated in either direction to fully closed.

Following correction of the valve position, EO levels inside the facility returned to historical normal levels.

## Corrective Action:

The following steps were taken as corrective action:

- The valve was put in the fully closed position and tested to verify on 23 Sept.

The following preventive actions are planned:
- All technicians will be trained on operation of this style valve.
  Target date: 30 Sept 19
- Blanks will be installed on the outlet to the Vacuum Exhaust Valve (on all vessels) to prevent flow regardless of valve position or condition.
  Target date: 25 Oct 19

## Impact of Incident:

Environmental:

Based on the information it is concluded that EO was released to the atmosphere.  An estimate of the quantity of EO released, per load, is included below.  The data confirms that the release is below the reportable quantity of 10 pounds per 24-hour period. The estimate is based on the technical information from the valve manufacturer and engineering principals.  The values expressed are not exact due to the dynamic conditions of the process but are believed to represent worst case.

Copy from re:SearchGA

The following are to support that the actual release was likely less than the calculated values:

- The Scrubber Inlet line is maintained at a negative pressure relative to atmosphere (by the function of the RTO) and therefore the gas would tend to flow to the Scrubber inlet line and be conveyed to the RTO for destruction.

- Line 5 had been experiencing High Separator Pressure warnings just prior to the incident. This indicates that the flame arrester at the outlet of the Vacuum Exhaust line was restricted. This would further indicate the path of least resistance as the line to the RTO.

- Inspection of the subject valve after removal showed a considerable buildup of debris in the area between the valve disc and valve seat which would further restrict flow to the Vacuum Exhaust line/atmosphere.

| Tracking Number | Site | Vessel | Total EO Used (lbs.) | EO removed by Vac Pump (lbs.) | To atmosphere (lbs.) | Emission Start | Emission Finish |
|---|---|---|---|---|---|---|---|
| 194822 | CV | 5 | 113 | 112.5 | 3.0 | 9/15/19 2:37 PM | 9/15/19 7:05 PM |
| 194766 | CV | 5 | 142 | 141.4 | 3.8 | 9/16/19 12:30 AM | 9/16/19 4:58 AM |
| 194850 | CV | 5 | 112 | 111.5 | 3.0 | 9/16/19 11:35 AM | 9/16/19 4:03 PM |
| 194774 | CV | 5 | 129 | 128.5 | 3.4 | 9/17/19 12:50 AM | 9/17/19 5:18 AM |
| 194864 | CV | 5 | 121 | 120.5 | 3.2 | 9/17/19 11:12 AM | 9/17/19 3:40 PM |
| 194827 | CV | 5 | 126 | 125.5 | 3.4 | 9/17/19 8:18 PM | 9/18/19 12:47 AM |
| 194702 | CV | 5 | 114 | 113.5 | 3.0 | 9/18/19 7:34 AM | 9/18/19 12:02 PM |
| 194838 | CV | 5 | 123 | 122.5 | 3.3 | 9/18/19 4:58 PM | 9/18/19 9:26 PM |
| 194887 | CV | 5 | 121 | 120.5 | 3.2 | 9/19/19 3:45 AM | 9/19/19 8:13 AM |
| 194699 | CV | 5 | 120 | 119.5 | 3.2 | 9/19/19 4:07 PM | 9/19/19 8:35 PM |
| 194803 | CV | 5 | 117 | 116.5 | 3.1 | 9/20/19 3:27 AM | 9/20/19 7:55 AM |
| 194902 | CV | 5 | 122 | 121.5 | 3.2 | 9/20/19 1:23 PM | 9/20/19 5:51 PM |
| 194882 | CV | 5 | 119 | 118.5 | 3.2 | 9/21/19 12:26 AM | 9/21/19 4:54 AM |
| 194918 | CV | 5 | 113 | 112.5 | 3.0 | 9/21/19 10:12 AM | 9/21/19 2:40 PM |
| 194909 | CV | 5 | 122 | 121.5 | 3.2 | 9/21/19 8:03 PM | 9/22/19 12:32 AM |
| 194890 | CV | 5 | 121 | 120.5 | 3.2 | 9/22/19 5:58 AM | 9/22/19 10:26 AM |
| 194814 | CV | 5 | 115 | 114.5 | 3.1 | 9/22/19 4:06 PM | 9/22/19 8:34 PM |
| | | Total | 2050 | | 54.5 | | |

Copy from re:SearchGA

## <u>AFFIDAVIT</u>

**STATE OF GEORGIA**

**COUNTY OF NEWTON**

1.      My name is Ron Pasdon and I am a resident of Walton County, Georgia. I am over 19 years of age, have personal knowledge of the facts set forth below and am competent and authorized to make this Affidavit.

2.      I am employed by Becton, Dickinson and Company ("BD") as Sr. Manager, Sterilization Operations at BD's Covington, Georgia facility ("Covington facility"). I have been employed at the Covington facility since May 2011. I am fully familiar with the sterilization operations conducted at the Covington facility, and with the facts set forth below.

3.      On September 17, 2019, the Covington facility conducted its usual, regularly scheduled sterilization processes, in accordance with its documented standard operating procedures, and consistent with its usual and anticipated level of sterilization activity conducted throughout 2019.

4.      On September 17, 2019, sterilization operations were conducted for 24 hours, using our usual complement of employees [over the course of three shifts].

5.      More particularly, on September 17, 2019, the Covington facility processed 11 sterilization load cycles in a 24-hour period. The load tracking numbers for the loads sterilized during that period are set forth on Attachment A to this affidavit. The amount of EtO used in the sterilization process for those cycles was 1,099 lbs. The Regenerative Thermal Oxidizer ("RTO") was operating normally during this time period and destroyed the EtO used in the sterilization process.

1



EXHIBIT

D

Copy from re:SearchGA

6.    The number of sterilization load cycles processed on September 17, 2019 and the quantity of EtO used is consistent with the customary number of load cycles processed and EtO used over the past 12 months at the Covington facility.

_Ron Pasdon 18 Sept 2019_

Ron Pasdon
Sr. Operations Manager, BD Covington Facility

Sworn to and subscribed before me this ___18___ day of September 2019.

_Cindy H Wilden_

Signature of Notary Public – State of Georgia

_____
Print, type, or stamp commissioned name of Notary
Personally Known _____ or Produced Identification _____
Type of Identification Produced _____

Copy from re:SearchGA

Attachment A

| Tracking Load Number | Date | EO Used LB |
|---|---|---|
| 194596 | 9/17/2019 | 34 |
| 194701 | 9/17/2019 | 32 |
| 194710 | 9/17/2019 | 34 |
| 194724 | 9/17/2019 | 110 |
| 194774 | 9/17/2019 | 129 |
| 194776 | 9/17/2019 | 124 |
| 194791 | 9/17/2019 | 128 |
| 194793 | 9/17/2019 | 132 |
| 194799 | 9/17/2019 | 119 |
| 194821 | 9/17/2019 | 136 |
| 194864 | 9/17/2019 | 121 |
| 11 Daily Total | | 1099 |

Copy from re:SearchGA

## AFFIDAVIT

**STATE OF GEORGIA**

**COUNTY OF NEWTON**

1.      My name is Ron Pasdon and I am a resident of Walton County, Georgia. I am over 19 years of age, have personal knowledge of the facts set forth below and am competent and authorized to make this Affidavit.

2.      I am employed by Becton, Dickinson and Company ("BD") as Sr. Manager, Sterilization Operations at BD's Covington, Georgia facility ("Covington facility"). I have been employed at the Covington facility since May 2011. I am fully familiar with the sterilization operations conducted at the Covington facility, and with the facts set forth below.

3.      On September 18, 2019, the Covington facility conducted its usual, regularly scheduled sterilization processes, in accordance with its documented standard operating procedures, and consistent with its usual and anticipated level of sterilization activity conducted throughout 2019.

4.      On September 18, 2019, sterilization operations were conducted for 24 hours, using our usual complement of employees [over the course of three shifts].

5.      More particularly, on September 18, 2019, the Covington facility processed 12 sterilization load cycles in a 24-hour period. The load tracking numbers for the loads sterilized during that period are set forth on Attachment A to this affidavit. The amount of EtO used in the sterilization process for those cycles was 1287 lbs.  The Regenerative Thermal Oxidizer ("RTO") was operating normally during this time period and destroyed the EtO used in the sterilization process.

1

Copy from re:SearchGA

6.    The number of sterilization load cycles processed on September 18, 2019 and the quantity of EtO used is consistent with the customary number of load cycles processed and EtO used over the past 12 months at the Covington facility.

Ron Pasdon

Sr. Operations Manager, BD Covington Facility

Sworn to and subscribed before me this ___19___ day of September 2019.



Signature of Notary Public – State of Georgia

Print, type, or stamp commissioned name of Notary
Personally Known ___ OR Produced Identification ____
Type of Identification Produced_____

2

Copy from re:SearchGA

Attachment A

| Tracking Load Number | Date | EO Used LB |
|---:|:---:|---:|
| 194620 | 9/18/2019 | 118 |
| 194623 | 9/18/2019 | 121 |
| 194702 | 9/18/2019 | 114 |
| 194719 | 9/18/2019 | 35 |
| 194771 | 9/18/2019 | 116 |
| 194820 | 9/18/2019 | 128 |
| 194827 | 9/18/2019 | 126 |
| 194838 | 9/18/2019 | 125 |
| 194843 | 9/18/2019 | 123 |
| 194860 | 9/18/2019 | 34 |
| 194867 | 9/18/2019 | 125 |
| 194885 | 9/18/2019 | 122 |
| 12 | Daily Total | 1287 |

Copy from re:SearchGA

## AFFIDAVIT

**STATE OF GEORGIA**

**COUNTY OF NEWTON**

1.      My name is Ron Pasdon and I am a resident of Walton County, Georgia. I am over 19 years of age, have personal knowledge of the facts set forth below and am competent and authorized to make this Affidavit.

2.      I am employed by Becton, Dickinson and Company ("BD") as Sr. Manager, Sterilization Operations at BD's Covington, Georgia facility ("Covington facility"). I have been employed at the Covington facility since May 2011. I am fully familiar with the sterilization operations conducted at the Covington facility, and with the facts set forth below.

3.      On September 19, 2019, the Covington facility conducted its usual, regularly scheduled sterilization processes, in accordance with its documented standard operating procedures, and consistent with its usual and anticipated level of sterilization activity conducted throughout 2019.

4.      On September 19, 2019, sterilization operations were conducted for 24 hours, using our usual complement of employees [over the course of three shifts].

5.      More particularly, on September 19, 2019, the Covington facility processed 11 sterilization load cycles in a 24-hour period. The load tracking numbers for the loads sterilized during that period are set forth on Attachment A to this affidavit. The amount of EtO used in the sterilization process for those cycles was 1160 lbs.  The Regenerative Thermal Oxidizer ("RTO") was operating normally during this time period and destroyed the EtO used in the sterilization process.

1

Copy from re:SearchGA

6.      The number of sterilization load cycles processed on September 19, 2019 and the quantity of EtO used is consistent with the customary number of load cycles processed and EtO used over the past 12 months at the Covington facility.

Ron Pasdon
Sr. Operations Manager, BD Covington Facility

Sworn to and subscribed before me this _____ day of September 2019.



Signature of Notary Public – State of Georgia

VICTORIA N. PLUNKETT
Print, type, or stamp commissioned name of Notary
Personally Known ✓ OR Produced Identification _____
Type of Identification Produced _____

2

Copy from re:SearchGA

| Tracking Load Number | Date | EO Used LB |
|---|---|---|
| 194551 | 9/19/2019 | 123 |
| 194624 | 9/19/2019 | 120 |
| 194699 | 9/19/2019 | 119 |
| 194722 | 9/19/2019 | 32 |
| 194811 | 9/19/2019 | 123 |
| 194830 | 9/19/2019 | 108 |
| 194862 | 9/19/2019 | 128 |
| 194863 | 9/19/2019 | 129 |
| 194874 | 9/19/2019 | 121 |
| 194887 | 9/19/2019 | 121 |
| 194893 | 9/19/2019 | 36 |
| 11 | Daily Total | 1160 |

Copy from re:SearchGA

## AFFIDAVIT

**STATE OF GEORGIA**

**COUNTY OF NEWTON**

1.      My name is Ron Pasdon and I am a resident of Walton County, Georgia. I am over 19 years of age, have personal knowledge of the facts set forth below and am competent and authorized to make this Affidavit.

2.      I am employed by Becton, Dickinson and Company ("BD") as Sr. Manager, Sterilization Operations at BD's Covington, Georgia facility ("Covington facility"). I have been employed at the Covington facility since May 2011. I am fully familiar with the sterilization operations conducted at the Covington facility, and with the facts set forth below.

3.      On September 20, 2019, the Covington facility conducted its usual, regularly scheduled sterilization processes, in accordance with its documented standard operating procedures, and consistent with its usual and anticipated level of sterilization activity conducted throughout 2019.

4.      On September 20, 2019, sterilization operations were conducted for 24 hours, using our usual complement of employees [over the course of three shifts].

5.      More particularly, on September 20, 2019, the Covington facility processed 10 sterilization load cycles in a 24-hour period. The load tracking numbers for the loads sterilized during that period are set forth on Attachment A to this affidavit. The amount of EtO used in the sterilization process for those cycles was 1024 lbs.  The Regenerative Thermal Oxidizer ("RTO") was operating normally during this time period and destroyed the EtO used in the sterilization process.

1

Copy from re:SearchGA

6.     The number of sterilization load cycles processed on September 20, 2019 and the
quantity of EtO used is consistent with the customary number of load cycles processed and EtO
used over the past 12 months at the Covington facility.

Ron Pasdon
Sr. Operations Manager, BD Covington Facility

Sworn to and subscribed before me this _____23_____ day of September 2019.

Signature of Notary Public – State of Georgia

VICTORIA N. PLUNKETT
Print, type, or stamp commissioned name of Notary
Personally Known ✔ OR Produced Identification _____
Type of Identification Produced_____

2

Copy from re:SearchGA

**Attachment A**

| Tracking Load Number | Date | EO Used LB |
|---|---|---|
| 194735 | 9/20/2019 | 36 |
| 194851 | 9/20/2019 | 104 |
| 194803 | 9/20/2019 | 117 |
| 194769 | 9/20/2019 | 123 |
| 194878 | 9/20/2019 | 125 |
| 194906 | 9/20/2019 | 34 |
| 194902 | 9/20/2019 | 122 |
| 194817 | 9/20/2019 | 106 |
| 194815 | 9/20/2019 | 120 |
| 194881 | 9/20/2019 | 137 |
| 10 Daily Total | | 1024 |

Copy from re:SearchGA

# AFFIDAVIT

**STATE OF GEORGIA**

**COUNTY OF NEWTON**

1.      My name is Ron Pasdon and I am a resident of Walton County, Georgia. I am over 19 years of age, have personal knowledge of the facts set forth below and am competent and authorized to make this Affidavit.

2.      I am employed by Becton, Dickinson and Company ("BD") as Sr. Manager, Sterilization Operations at BD's Covington, Georgia facility ("Covington facility"). I have been employed at the Covington facility since May 2011. I am fully familiar with the sterilization operations conducted at the Covington facility, and with the facts set forth below.

3.      On September 21, 2019, the Covington facility conducted its usual, regularly scheduled sterilization processes, in accordance with its documented standard operating procedures, and consistent with its usual and anticipated level of sterilization activity conducted throughout 2019.

4.      On September 21, 2019, sterilization operations were conducted for 24 hours, using our usual complement of employees [over the course of three shifts].

5.      More particularly, on September 21, 2019, the Covington facility processed 11 sterilization load cycles in a 24-hour period. The load tracking numbers for the loads sterilized during that period are set forth on Attachment A to this affidavit. The amount of EtO used in the sterilization process for those cycles was 1052 lbs.  The Regenerative Thermal Oxidizer ("RTO") was operating normally during this time period and destroyed the EtO used in the sterilization process.

Copy from re:SearchGA

6.     The number of sterilization load cycles processed on September 21, 2019 and the quantity of EtO used is consistent with the customary number of load cycles processed and EtO used over the past 12 months at the Covington facility.

_Ron Pasdon 23 Sept. 2019_

Ron Pasdon
Sr. Operations Manager, BD Covington Facility

Sworn to and subscribed before me this  _23_  day of September 2019.

_Victoria N. Plunkett_
Signature of Notary Public – State of Georgia

_VICTORIA N. Plunkett_
Print, type, or stamp commissioned name of Notary
Personally Known  ⟋  OR Produced Identification _____
Type of Identification Produced_____

2

Copy from re:SearchGA

Attachment A

| Tracking Load Number | Date | EO Used LB |
|---|---|---|
| 194768 | 9/21/2019 | 34 |
| 194882 | 9/21/2019 | 119 |
| 194795 | 9/21/2019 | 119 |
| 194854 | 9/21/2019 | 107 |
| 194802 | 9/21/2019 | 121 |
| 194896 | 9/21/2019 | 35 |
| 194918 | 9/21/2019 | 113 |
| 194891 | 9/21/2019 | 133 |
| 194910 | 9/21/2019 | 128 |
| 194877 | 9/21/2019 | 109 |
| 194895 | 9/21/2019 | 34 |
| 11 Daily Total | | 1052 |

Copy from re:SearchGA

# AFFIDAVIT

**STATE OF GEORGIA**

**COUNTY OF NEWTON**

1.      My name is Ron Pasdon and I am a resident of Walton County, Georgia. I am over 19 years of age, have personal knowledge of the facts set forth below and am competent and authorized to make this Affidavit.

2.      I am employed by Becton, Dickinson and Company ("BD") as Sr. Manager, Sterilization Operations at BD's Covington, Georgia facility ("Covington facility"). I have been employed at the Covington facility since May 2011. I am fully familiar with the sterilization operations conducted at the Covington facility, and with the facts set forth below.

3.      On September 22, 2019, the Covington facility conducted its usual, regularly scheduled sterilization processes, in accordance with its documented standard operating procedures, and consistent with its usual and anticipated level of sterilization activity conducted throughout 2019.

4.      On September 22, 2019, sterilization operations were conducted for 24 hours, using our usual complement of employees [over the course of three shifts].

5.      More particularly, on September 22, 2019, the Covington facility processed 12 sterilization load cycles in a 24-hour period. The load tracking numbers for the loads sterilized during that period are set forth on Attachment A to this affidavit. The amount of EtO used in the sterilization process for those cycles was 1327 lbs.  The Regenerative Thermal Oxidizer ("RTO") was operating normally during this time period and destroyed the EtO used in the sterilization process.

1

Copy from re:SearchGA

6.    The number of sterilization load cycles processed on September 22, 2019 and the quantity of EtO used is consistent with the customary number of load cycles processed and EtO used over the past 12 months at the Covington facility.

_R. Pasdon_   23 Sept. 2019

Ron Pasdon

Sr. Operations Manager, BD Covington Facility

Sworn to and subscribed before me this ___23___ day of September 2019.

_Victoria N. Plunkett_

Signature of Notary Public – State of Georgia

_VICTORIA N. Plunkett_

Print, type, or stamp commissioned name of Notary

Personally Known ✓ OR Produced Identification ____

Type of Identification Produced_____

2

Copy from re:SearchGA

Attachment A

| Tracking Load Number | Date | EO Used LB |
|---|---|---|
| 194909 | 9/22/2019 | 122 |
| 194892 | 9/22/2019 | 122 |
| 194907 | 9/22/2019 | 133 |
| 194933 | 9/22/2019 | 34 |
| 194816 | 9/22/2019 | 117 |
| 194890 | 9/22/2019 | 121 |
| 194935 | 9/22/2019 | 126 |
| 194809 | 9/22/2019 | 125 |
| 194945 | 9/22/2019 | 38 |
| 194925 | 9/22/2019 | 123 |
| 194814 | 9/22/2019 | 115 |
| 194915 | 9/22/2019 | 151 |
| 12 Daily Total | | 1327 |

Copy from re:SearchGA

**AFFIDAVIT**

**STATE OF GEORGIA**

**COUNTY OF NEWTON**

1.      My name is Ron Pasdon and I am a resident of Walton County, Georgia. I am over 19 years of age, have personal knowledge of the facts set forth below and am competent and authorized to make this Affidavit.

2.      I am employed by Becton, Dickinson and Company ("BD") as Sr. Manager, Sterilization Operations at BD's Covington, Georgia facility ("Covington facility"). I have been employed at the Covington facility since May 2011. I am fully familiar with the sterilization operations conducted at the Covington facility, and with the facts set forth below.

3.      On September 23, 2019, the Covington facility conducted its usual, regularly scheduled sterilization processes, in accordance with its documented standard operating procedures, and consistent with its usual and anticipated level of sterilization activity conducted throughout 2019.

4.      On September 23, 2019, sterilization operations were conducted for 24 hours, using our usual complement of employees [over the course of three shifts].

5.      More particularly, on September 23, 2019, the Covington facility processed 11 sterilization load cycles in a 24-hour period. The load tracking numbers for the loads sterilized during that period are set forth on Attachment A to this affidavit. The amount of EtO used in the sterilization process for those cycles was 1102 lbs.  The Regenerative Thermal Oxidizer ("RTO") was operating normally during this time period and destroyed the EtO used in the sterilization process.

Copy from re:SearchGA

6.    The number of sterilization load cycles processed on September 23, 2019 and the quantity of EtO used is consistent with the customary number of load cycles processed and EtO used over the past 12 months at the Covington facility.

Ron Pasdon
Sr. Operations Manager, BD Covington Facility

Sworn to and subscribed before me this ____24____ day of September 2019.

Signature of Notary Public – State of Georgia

Print, type, or stamp Commissioned name of Notary
Personally Known ____ OR Produced Identification ____
Type of Identification Produced: ____

2

Copy from re:SearchGA

**Attachment A**

| Tracking Load Number | Date | EO Used LB |
|---:|:---:|---:|
| 194921 | 9/23/2019 | 30 |
| 194926 | 9/23/2019 | 126 |
| 194922 | 9/23/2019 | 127 |
| 194927 | 9/23/2019 | 129 |
| 194920 | 9/23/2019 | 123 |
| 194970 | 9/23/2019 | 37 |
| 194952 | 9/23/2019 | 123 |
| 194939 | 9/23/2019 | 135 |
| 194961 | 9/23/2019 | 115 |
| 194835 | 9/23/2019 | 125 |
| 194975 | 9/23/2019 | 32 |
| 11 | Daily Total | 1102 |

Copy from re:SearchGA

## AFFIDAVIT

**STATE OF GEORGIA**

**COUNTY OF NEWTON**

1.      My name is Ron Pasdon and I am a resident of Walton County, Georgia. I am over 19 years of age, have personal knowledge of the facts set forth below and am competent and authorized to make this Affidavit.

2.      I am employed by Becton, Dickinson and Company ("BD") as Sr. Manager, Sterilization Operations at BD's Covington, Georgia facility ("Covington facility"). I have been employed at the Covington facility since May 2011. I am fully familiar with the sterilization operations conducted at the Covington facility, and with the facts set forth below.

3.      On September 24, 2019, the Covington facility conducted its usual, regularly scheduled sterilization processes, in accordance with its documented standard operating procedures, and consistent with its usual and anticipated level of sterilization activity conducted throughout 2019.

4.      On September 24, 2019, sterilization operations were conducted for 24 hours, using our usual complement of employees [over the course of three shifts].

5.      More particularly, on September 24, 2019, the Covington facility processed 11 sterilization load cycles in a 24-hour period. The load tracking numbers for the loads sterilized during that period are set forth on Attachment A to this affidavit. The amount of EtO used in the sterilization process for those cycles was 1205 lbs.  The Regenerative Thermal Oxidizer ("RTO") was operating normally during this time period and destroyed the EtO used in the sterilization process.

1

Copy from re:SearchGA

6.  The number of sterilization load cycles processed on September 24, 2019 and the quantity of EtO used is consistent with the customary number of load cycles processed and EtO used over the past 12 months at the Covington facility.

_R Pasdon 25 Sept 2019_

Ron Pasdon
Sr. Operations Manager, BD Covington Facility

Sworn to and subscribed before me this ___25___ day of September 2019.

_Cindy H Wilder_

Signature of Notary Public – State of Georgia

Print, type, or stamp commissioned name of Notary
Personally Known ____ OR Produced Identification ____
Type of Identification Produced _____

2

Copy from re:SearchGA

Attachment A

| Tracking Load Number | Date | EO Used LB |
|---|---|---|
| 194801 | 9/24/2019 | 118 |
| 194940 | 9/24/2019 | 153 |
| 194954 | 9/24/2019 | 121 |
| 194836 | 9/24/2019 | 119 |
| 194946 | 9/24/2019 | 35 |
| 194950 | 9/24/2019 | 132 |
| 194951 | 9/24/2019 | 127 |
| 194978 | 9/24/2019 | 127 |
| 194999 | 9/24/2019 | 35 |
| 194962 | 9/24/2019 | 120 |
| 194948 | 9/24/2019 | 118 |
| 11 Daily Total | | 1205 |

**City of Covington Ethylene Oxide Ambient Monitoring Sampling Locations**







Summary of Ethylene Oxide Ambient Monitoring Data - City of Covington, Georgia
Collected from 9/17/2019 through 9/24/2019

| Location ID | Sample Location | Montrose Sample ID | Sample Start | Sample End | Result ppbv | ug/m3 |
|---|---|---|---|---|---|---|
| 1 | Rear of BD Facility | 641120-1-P-20190917 | 9/17/2019 | 9/18/2019 | 0.715 | 1.29 |
| 1 | Rear of BD Facility | 641120-1-P-20190918 | 9/18/2019 | 9/19/2019 | 0.220 | 0.396 |
| 1 | Rear of BD Facility | 641120-1-P-20190919 | 9/19/2019 | 9/20/2019 | 0.168 | 0.302 |
| 1 | Rear of BD Facility | 641120-1-P-20190920 | 9/20/2019 | 9/21/2019 | 0.604 | 1.09 |
| 1 | Rear of BD Facility | 641120-1-P-20190921 | 9/21/2019 | 9/22/2019 | 1.87 | 3.37 |
| 1 | Rear of BD Facility | 641120-1-P-20190922 | 9/22/2019 | 9/23/2019 | 6.85 | 12.3 |
| 1 | Rear of BD Facility | 641120-1-P-20190923 | 9/23/2019 | 9/24/2019 | 1.61 | 2.90 |
| 1 | Rear of BD Facility (ERG) | 641120-1-P-20190923 | 9/23/2019 | 9/24/2019 | 0.851 | 1.54 |
| 2 | BD Employee Parking Entrance | 641120-2-P-20190917 | 9/17/2019 | 9/18/2019 | 5.51 | 9.92 |
| 2 | BD Employee Parking Entrance  (ERG) | 641120-2-E-20190917 | 9/17/2019 | 9/18/2019 | 3.53 | 6.39 |
| 2 | BD Employee Parking Entrance | 641120-2-P-20190918 | 9/18/2019 | 9/19/2019 | 0.122 | 0.220 |
| 2 | BD Employee Parking Entrance | 641120-2-P-20190919 | 9/19/2019 | 9/20/2019 | 0.0885 | 0.160 |
| 2 | BD Employee Parking Entrance | 641120-2-P-20190920 | 9/20/2019 | 9/21/2019 | 0.109 | 0.197 |
| 2 | BD Employee Parking Entrance | 641120-2-P-20190921 | 9/21/2019 | 9/22/2019 | 0.305 | 0.549 |
| 2 | BD Employee Parking Entrance | 641120-2-P-20190922 | 9/22/2019 | 9/23/2019 | 6.68 | 12.0 |
| 2 | BD Employee Parking Entrance | 641120-2-P-20190923 | 9/23/2019 | 9/24/2019 | 3.06 | 5.51 |
| 3 | Settlers Grove Area | 641120-3-P-20190917 | 9/17/2019 | 9/18/2019 | 7.65 | 13.8 |
| 3 | Settlers Grove Area (Duplicate) | 641120-3-D-20190917 | 9/17/2019 | 9/18/2019 | 6.94 | 12.5 |
| 3 | Settlers Grove Area | 641120-3-P-20190918 | 9/18/2019 | 9/19/2019 | <0.0172 | <0.0310 |
| 3 | Settlers Grove Area (ERG) | 641120-3-P-20190918 | 9/18/2019 | 9/19/2019 | 0.194 | 0.351 |
| 3 | Settlers Grove Area | 641120-3-P-20190919 | 9/19/2019 | 9/20/2019 | 0.105 | 0.189 |
| 3 | Settlers Grove Area | 641120-3-P-20190920 | 9/20/2019 | 9/21/2019 | 0.103 | 0.186 |
| 3 | Settlers Grove Area | 641120-3-P-20190921 | 9/21/2019 | 9/22/2019 | 0.321 | 0.578 |
| 3 | Settlers Grove Area | 641120-3-P-20190922 | 9/22/2019 | 9/23/2019 | 4.69 | 8.45 |
| 3 | Settlers Grove Area | 641120-3-P-20190923 | 9/23/2019 | 9/24/2019 | 2.95 | 5.31 |
| 4 | Covington Mill Area | 641120-4-P-20190917 | 9/17/2019 | 9/18/2019 | 3.05 | 5.50 |
| 4 | Covington Mill Area | 641120-4-P-20190918 | 9/18/2019 | 9/19/2019 | 0.649 | 1.17 |
| 4 | Covington Mill Area | 641120-4-P-20190919 | 9/19/2019 | 9/20/2019 | 0.328 | 0.592 |
| 4 | Covington Mill Area (ERG) | 641120-4-P-20190919 | 9/19/2019 | 9/20/2019 | 0.0567 | 1.03 |
| 4 | Covington Mill Area | 641120-4-P-20190920 | 9/20/2019 | 9/21/2019 | 5.35 | 9.64 |
| 4 | Covington Mill Area (Duplicate) | 641120-4-D-20190920 | 9/20/2019 | 9/21/2019 | 5.30 | 9.54 |
| 4 | Covington Mill Area | 641120-4-P-20190921 | 9/21/2019 | 9/22/2019 | 7.06 | 12.7 |
| 4 | Covington Mill Area | 641120-4-P-20190922 | 9/22/2019 | 9/23/2019 | 8.51 | 15.3 |
| 4 | Covington Mill Area (ERG) | 641120-4-P-20190922 | 9/22/2019 | 9/23/2019 | 5.66 | 10.2 |

(Duplicate) = Duplicate Sample Analyzed by Enthalpy
(ERG) = Duplicate Sample Analyzed by Eastern Research Group Laboratory



Summary of Ethylene Oxide Ambient Monitoring Data - City of Covington, Georgia
Collected from 9/17/2019 through 9/24/2019

| Location ID | Sample Location | Montrose Sample ID | Sample Start | Sample End | Result ppbv | ug/m3 |
|---|---|---|---|---|---|---|
| 4 | Covington Mill Area | 641120-4-P-20190923 | 9/23/2019 | 9/24/2019 | 0.142 | 0.255 |
| 5 | Williams Street Water Plant | 641120-5-P-20190917 | 9/17/2019 | 9/18/2019 | 0.240 | 0.432 |
| 5 | Williams Street Water Plant | 641120-5-P-20190918 | 9/18/2019 | 9/19/2019 | 0.620 | 1.12 |
| 5 | Williams Street Water Plant | 641120-5-P-20190919 | 9/19/2019 | 9/20/2019 | 1.01 | 1.83 |
| 5 | Williams Street Water Plant | 641120-5-P-20190920 | 9/20/2019 | 9/21/2019 | 0.623 | 1.12 |
| 5 | Williams Street Water Plant | 641120-5-P-20190921 | 9/21/2019 | 9/22/2019 | 1.23 | 2.21 |
| 5 | Williams Street Water Plant | 641120-5-P-20190922 | 9/22/2019 | 9/23/2019 | 0.825 | 1.49 |
| 5 | Williams Street Water Plant | 641120-5-P-20190923 | 9/23/2019 | 9/24/2019 | 0.162 | 0.291 |
| 6 | Mount Pleasant | 641120-6-P-20190917 | 9/17/2019 | 9/18/2019 | 0.108 | 0.195 |
| 6 | Mount Pleasant (ERG) | 641120-6-P-20190917 | 9/17/2019 | 9/18/2019 | 0.254 | 0.460 |
| 6 | Mount Pleasant | 641120-6-P-20190918 | 9/18/2019 | 9/19/2019 | 0.785 | 1.41 |
| 6 | Mount Pleasant | 641120-6-P-20190919 | 9/19/2019 | 9/20/2019 | 0.0829 | 0.149 |
| 6 | Mount Pleasant | 641120-6-P-20190920 | 9/20/2019 | 9/21/2019 | 0.0654 | 0.118 |
| 6 | Mount Pleasant | 641120-6-P-20190921 | 9/21/2019 | 9/22/2019 | 0.0831 | 0.150 |
| 6 | Mount Pleasant | 641120-6-P-20190922 | 9/22/2019 | 9/23/2019 | 0.113 | 0.203 |
| 6 | Mount Pleasant | 641120-6-P-20190923 | 9/23/2019 | 9/24/2019 | 0.206 | 0.371 |
| 7 | Covington Airport | 641120-7-P-20190917 | 9/17/2019 | 9/18/2019 | 0.0890 | 0.160 |
| 7 | Covington Airport | 641120-7-P-20190918 | 9/18/2019 | 9/19/2019 | 0.0721 | 0.130 |
| 7 | Covington Airport (ERG) | 641120-7-P-20190918 | 9/18/2019 | 9/19/2019 | <0.614 | <0.111 |
| 7 | Covington Airport | 641120-7-P-20190919 | 9/19/2019 | 9/20/2019 | 0.0865 | 0.156 |
| 7 | Covington Airport | 641120-7-P-20190920 | 9/20/2019 | 9/21/2019 | 0.0680 | 0.123 |
| 7 | Covington Airport | 641120-7-P-20190921 | 9/21/2019 | 9/22/2019 | 0.151 | 0.273 |
| 7 | Covington Airport | 641120-7-P-20190922 | 9/22/2019 | 9/23/2019 | 0.138 | 0.248 |
| 7 | Covington Airport | 641120-7-P-20190923 | 9/23/2019 | 9/24/2019 | 0.0790 | 0.142 |
| 8 | Rural SE Newton County | 641120-8-P-20190917 | 9/17/2019 | 9/18/2019 | 0.120 | 0.216 |
| 8 | Rural SE Newton County | 641120-8-P-20190918 | 9/18/2019 | 9/19/2019 | 0.0734 | 0.132 |
| 8 | Rural SE Newton County | 641120-38-P-20190919 | 9/19/2019 | 9/20/2019 | 0.0917 | 0.165 |
| 8 | Rural SE Newton County | 641120-8-P-20190920 | 9/20/2019 | 9/21/2019 | 0.0906 | 0.163 |
| 8 | Rural SE Newton County | 641120-8-P-20190921 | 9/21/2019 | 9/22/2019 | 0.0781 | 0.141 |
| 8 | Rural SE Newton County | 641120-8-P-20190922 | 9/22/2019 | 9/23/2019 | 0.0653 | 0.118 |
| 8 | Rural SE Newton County | 641120-8-P-20190923 | 9/23/2019 | 9/24/2019 | 0.346 | 0.624 |
| 9 | South Covington Area | 641120-9-P-20190917 | 9/17/2019 | 9/18/2019 | 0.122 | 0.219 |
| 9 | South Covington Area | 641120-9-P-20190918 | 9/18/2019 | 9/19/2019 | 0.118 | 0.212 |
| 9 | South Covington Area | 641120-9-P-20190919 | 9/19/2019 | 9/20/2019 | 0.106 | 0.192 |

(Duplicate) = Duplicate Sample Analyzed by Enthalpy
(ERG) = Duplicate Sample Analyzed by Eastern Research Group Laboratory



Summary of Ethylene Oxide Ambient Monitoring Data - City of Covington, Georgia
Collected from 9/17/2019 through 9/24/2019

| Location ID | Sample Location | Montrose Sample ID | Sample Start | Sample End | Result ppbv | ug/m3 |
|---|---|---|---|---|---|---|
| 9 | South Covington Area | 641120-9-P-20190920 | 9/20/2019 | 9/21/2019 | 0.197 | 0.356 |
| 9 | South Covington Area (ERG) | 641120-9-P-20190920 | 9/20/2019 | 9/21/2019 | <0.0614 | <0.111 |
| 9 | South Covington Area | 641120-9-P-20190921 | 9/21/2019 | 9/22/2019 | 0.259 | 0.466 |
| 9 | South Covington Area | 641120-9-P-20190922 | 9/22/2019 | 9/23/2019 | 0.199 | 0.359 |
| 9 | South Covington Area | 641120-9-P-20190923 | 9/23/2019 | 9/24/2019 | 0.0724 | 0.130 |
| 10 | Conyers, GA Location | 641120-10-P-20190917 | 9/17/2019 | 9/18/2019 | 0.154 | 0.278 |
| 10 | Conyers, GA Location | 641120-10-P-20190918 | 9/18/2019 | 9/19/2019 | 0.0890 | 0.160 |
| 10 | Conyers, GA Location | 641120-10-P-20190919 | 9/19/2019 | 9/20/2019 | 0.165 | 0.297 |
| 10 | Conyers, GA Location | 641120-10-P-20190920 | 9/20/2019 | 9/21/2019 | 0.107 | 0.192 |
| 10 | Conyers, GA Location | 641120-10-P-20190921 | 9/21/2019 | 9/22/2019 | 0.0878 | 0.158 |
| 10 | Conyers, GA Location | 641120-10-P-20190922 | 9/22/2019 | 9/23/2019 | 0.119 | 0.214 |
| 10 | Conyers, GA Location | 641120-10-P-20190922 | 9/22/2019 | 9/23/2019 | 0.117 | 0.212 |
| 10 | Conyers, GA Location | 641120-10-P-20190923 | 9/23/2019 | 9/24/2019 | 0.0908 | 0.164 |
| 11 | EPD South DeKalb Monitoring Site | 641120-11-P-20190919 | 9/19/2019 | 9/20/2019 | 0.0800 | 0.144 |

(Duplicate) = Duplicate Sample Analyzed by Enthalpy
(ERG) = Duplicate Sample Analyzed by Eastern Research Group Laboratory





**Sampling Period**
Wednesday, September 18, 2019 11:06 AM
THROUGH
Thursday, September 19, 2019 1:45 PM

**Legend**

| Sample Type | Sampling Location |
| --- | --- |
| | Concentration ppbv \| µg/m³ |

P   Primary Sample
D   Duplicate Sample
E   ERG Analyzed Duplicate

Air Sample Location
Weather Station
Facility

Copy from re:SearchGA



Copy from re:SearchGA







Copy from re:SearchGA





Site 1-Rear of BD Facility

Copy from re:SearchGA





Site 2-BD Employee Parking Entrance





Copy from re:SearchGA





Site 4-Covington Mill Area

Copy from re:SearchGA





Copy from re:SearchGA

# MONTROSE
AIR QUALITY SERVICES

## Site 6-Mount Pleasant



EtO Concentration (ug/m3)

0.195 — 9/17/2019
1.41 — 9/18/2019
0.149 — 9/19/2019
0.118 — 9/20/2019
0.15 — 9/21/2019
0.203 — 9/22/2019
0.371 — 9/23/2019

Enthalpy Result



## Site 7-Covington Airport







## Site 8-Rural SE Newton County

EtO Concentration (ug/m3)

0.216 — 9/17/2019
0.132 — 9/18/2019
0.165 — 9/19/2019
0.163 — 9/20/2019
0.141 — 9/21/2019
0.118 — 9/22/2019
0.624 — 9/23/2019

— ● — Enthalpy Result

Copy from re:SearchGA



Site 9-South Covington Area

Copy from re:SearchGA

MONTROSE
AIR QUALITY SERVICES

## Site 10-Conyers, GA Location



Copy from re:SearchGA